# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,
Plaintiff and Respondent,

v.

NORMAN THOMAS SALAZAR,
Defendant and Appellant.

S275788

Second Appellate District, Division Six
B309803

Ventura County Superior Court
2018027995

November 20, 2023

Justice Groban authored the opinion of the Court, in which
Chief Justice Guerrero and Justices Corrigan, Liu, Kruger,
Jenkins, and Evans concurred.

PEOPLE v. SALAZAR

S275788


Opinion of the Court by Groban, J.


After Norman Salazar had been sentenced but while his appeal was still pending, the Legislature enacted Senate Bill No. 567 (2021–2022 Reg. Sess.) (Stats. 2021, ch. 731) (Senate Bill 567). Though Salazar received a middle term sentence at the time of his original sentencing, the new statute creates a presumption that the sentencing court "shall" enter a lower term sentence when, among other things, a "psychological, physical, or childhood trauma" contributed to the offense. (Pen. Code, § 1170, subd. (b)(6) & (A).)[1] The sentencing court may only depart from this lower term presumption if it finds that the aggravating circumstances outweigh the mitigating circumstances such that the lower term would be contrary to "the interests of justice." (*Id.*, subd. (b)(6).) The parties agree that this new legislation applies on appeal to Salazar's nonfinal case. (See *In re Estrada* (1965) 63 Cal.2d 740, 745.) The Attorney General further concedes that the record discloses that Salazar may have suffered a qualifying trauma, which would appear to meet the statute's threshold requirement for triggering the lower term presumption. (See *People v. Frahs* (2020) 9 Cal.5th 618, 638–640 (*Frahs*).)

In *People v. Gutierrez* (2014) 58 Cal.4th 1354 (*Gutierrez*), we held that, in a case like this one, when a sentencing court

---

[1]     Undesignated statutory references are to the Penal Code.

1

was not aware of the full scope of its discretionary powers at the time the defendant was sentenced, "the appropriate remedy is to remand for resentencing unless the record 'clearly indicate[s]' that the trial court would have reached the same conclusion 'even if it had been aware that it had such discretion.' " (*Id.* at p. 1391.) We granted review to determine whether the Court of Appeal erred here by finding that the record " 'clearly indicate[s]' " the trial court would not have imposed a lower term sentence if it had been aware of the scope of its discretion. (*Ibid.*) We find no clear indication in the record that the sentencing court would have imposed the same sentence had it been aware of " 'the scope of its discretionary powers' " under the current section 1170. (*Gutierrez*, at p. 1391.) We therefore reverse the judgment of the Court of Appeal and remand the case to the Court of Appeal with instructions to remand the case to the superior court for resentencing.

## I. Background

In 2018, Salazar and M.Q. were in a dating relationship. On August 12, 2018, after their relationship had ended, M.Q. knocked on the door to Salazar's motel room around 2:00 or 3:00 p.m. M.Q. testified that Salazar pulled her inside by the shirt and punched her in the head, causing her to bleed. Within a few minutes, he put a desk in front of the door to prevent M.Q. from leaving.

Salazar accused M.Q. of being followed or bringing people with her. Even though his motorcycle was in the parking lot, Salazar repeatedly claimed M.Q. stole it and sold it to someone who replaced it with a different bike. By 7:00 p.m., Salazar had punched M.Q. five to ten times and sprayed her with pepper spray five to 10 times. Around 7:00 p.m., Salazar also

threatened to kill M.Q. Later in the evening, Salazar kicked M.Q. between the thighs, knocking her to the ground. Salazar ingested five lines of methamphetamine while in the motel room.

According to M.Q., around 8:00 p.m., Salazar insisted that she accompany him in her car to purchase more drugs. Before leaving the motel room, Salazar broke M.Q.'s phone into two and took keys from her purse. From about 11:00 p.m. until about 9:00 a.m. the next morning, Salazar drove M.Q.'s car while she sat in the passenger seat. He continued to punch and spray her with pepper spray and with glass cleaner.

M.Q. testified that at about 9:00 a.m., they returned to the motel room. At about 10:00 a.m., Salazar drove M.Q.'s car to a park, with M.Q. following in his truck. Once there, he became angry that she did not park his truck correctly and bit her face, making her bleed. Salazar then drove the two of them back to the motel in his truck, leaving M.Q.'s car behind. They then returned to the park a second time with M.Q. driving the truck and Salazar driving his motorcycle. M.Q. and Salazar then both rode to the motel on Salazar's motorcycle, leaving the truck behind at the park.

The two then proceeded on Salazar's motorcycle to Chase Bank. When they arrived at the bank, Salazar said "we're going to go to the ATM to pull out the $3,000 that [M.Q.] owed him" for his motorcycle. M.Q. replied that they had to go inside because ATMs do not give out $3,000. When they went inside, M.Q. pulled her sunglasses up and asked a bank employee to call the police. Police responded and arrested Salazar.

M.Q. went to the hospital for treatment. The treating physician found that she had a fractured cheek bone, a closed

head injury, swelling around her eye, and an injury consistent with a bite mark on her face.

The jury acquitted Salazar of kidnapping but found him guilty of the lesser included offense of false imprisonment by violence or menace (§§ 236, 237, subd. (a)). The jury also found Salazar guilty of infliction of corporal injury on a person with whom he had a current or former dating relationship (§ 273.5, subd. (a)). The jury acquitted Salazar of attempted robbery (§§ 664, 211). The jury did not reach agreement on an allegation that Salazar personally inflicted great bodily injury (§ 12022.7, subd. (e)), and this charge was subsequently dismissed pursuant to section 1383. Salazar admitted a prior strike (§§ 667, subds. (c)(1), (e)(1), 1170.12, subds. (a)(1), (c)(1)).

At Salazar's sentencing hearing in November 2020, the court considered a probation report, a defense sentencing memorandum, and the prosecution's statement in aggravation. The defense sentencing memorandum reported that Salazar's father was an alcoholic and strictly disciplined him. According to Salazar, he first tried alcohol, smoked marijuana, and snorted cocaine when he was 13. From the age of 13 to 20, he used psychedelic drugs such as LSD frequently, sometimes daily. Arrest records reflect that Salazar used methamphetamine.

The sentencing memorandum also indicates that Salazar was diagnosed with paranoid schizoaffective disorder, anxiety, and claustrophobia, his mother and sister were diagnosed with bipolar disorder, and his father was diagnosed with paranoid schizophrenia. In 2011, Salazar's father passed away, and in 2013, his mother died of pancreatic cancer.

In November 2009, at the age of 36 years old, Salazar was admitted to the Ventura County Psychiatric Unit. According to

the intake form, Salazar stated he had tried to kill himself, he thought his mother's boyfriend was trying to kill him, and he had a history of self-harm and suicidal ideations. In December 2009, at a subsequent adult services assessment, Salazar exhibited paranoid ideation and reported hallucinations. Salazar reported that he drank seven to eight beers daily and occasionally used cocaine.

A Ventura County Behavior Health Client Assessment Form, dated December 2011, states that prior records indicate that Salazar was diagnosed with schizoaffective disorder, depressed type, in May 2010 and had a history of paranoia and depression since he was 10 years old. During the December 2011 client assessment, Salazar further reported that his father was physically abusive beginning at age five. He reported visual hallucinations since childhood. The client assessment form states that Salazar has symptoms of posttraumatic stress disorder (PTSD), including flashbacks of rapes/physical assaults when in prison, as well as symptoms of attention deficit hyperactivity disorder (ADHD) that "were likely related to trauma in childhood." The client assessment form concluded that Salazar meets the criteria for schizoaffective disorder, major depressive disorder, and dysthymic disorder.

The prosecution also filed a statement in aggravation. The statement details Salazar's prior criminal history, which includes a misdemeanor conviction for assault with a deadly weapon in 1997 (§ 245); a conviction for battery on a spouse in 1998 (§ 243, subd. (e)); a misdemeanor conviction for inflicting injury on a spouse in 1998 (§ 273.5, subd. (a)); a conviction for possessing a stolen vehicle from 2009 (§ 496d, subd. (a)); a conviction for battery from 2009 (§ 242); a conviction for evading police with willful disregard for safety from 2012 (§ 2800.2,

subd. (a)); and a conviction for evading police with willful disregard for safety from 2014 (§ 2800.2, subd. (a)). The prosecution's statement notes that after Salazar was arrested for the present case, six new cases had been filed against him. The statement also notes that Salazar has been committed to the Department of Corrections and Rehabilitation 11 times since 2001.

At the sentencing hearing, the court denied Salazar's request to dismiss the prior strike conviction. (See *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497.) Before doing so, the court praised Salazar's courtroom conduct, stating: "You presented yourself very well. You could not have been more respectful, both to your counsel and to [the prosecutor] and to me and to the jury." The court was "hopeful that once this is done, that you can become the best version of yourself, like your sister is indicating." The court added that "it seems to me like you have more that you could offer." The court denied the *Romero* motion though because Salazar had a "long and continuous criminal history" and the strike was a "serious offense." The court noted that Salazar had been arrested six times since the offenses in this case were committed and had a 23-year criminal history from 1995 to 2018, plus a juvenile offense in 1991. The court found that "a lot" of that criminal history "is drug related, and a lot of it may be because of suffering from your father's death, and then I think it was a couple years later, your mother's death. And it sounds like you were very much involved in your mother's last few months of life, and you and she were lucky to have that opportunity. But I simply cannot, based on that history, strike the strike."

The court also denied Salazar's request to stay sentencing on the false imprisonment conviction pursuant to section 654

6

because "I cannot find that this is an ongoing singular continuous course of conduct. I think that there were breaks." "Based on everything that I've said," the court then also denied the defense request to impose concurrent sentences on false imprisonment and inflicting corporal injury, and instead imposed consecutive sentences.[2]

Ultimately, the court imposed the middle term of three years on inflicting corporal injury, doubled because of the prior strike, plus a consecutive eight months for false imprisonment (one-third the middle term), doubled because of the prior strike, for a total prison sentence of seven years and four months. The court explained: "I'm going to select not the high term, but the mid term, and that's based on having heard the evidence and based on the fact that the last seven years or so, the defendant's criminal history has been drug related." The court found "that defendant has a history of drug abuse and/or alcohol abuse and recommend[ed] that he participate in a treatment program." The court also issued a criminal protective order, protecting M.Q. from Salazar for ten years.

Effective January 1, 2022 and while Salazar's appeal was pending, Senate Bill 567 amended section 1170 to provide that "unless the court finds that the aggravating circumstances outweigh the mitigating circumstances that imposition of the lower term would be contrary to the interests of justice, the court

---

[2] The decision to grant a stay in this context is contingent upon section 654, which generally prohibits a defendant from being punished for "multiple offenses based on the same course of conduct." (*People v. Lopez* (2020) 9 Cal.5th 254, 268, fn. 5.) The decision to impose a consecutive or concurrent sentence similarly takes into account whether the offenses involved the same or separate conduct. (See Cal. Rules of Court, rule 4.425.)

shall order imposition of the lower term if," among other things, the defendant "has experienced psychological, physical, or childhood trauma," and this trauma "was a contributing factor in the commission of the offense." (§ 1170, subd. (b)(6) & (A).)[3] The Court of Appeal asked the parties to submit supplemental briefing discussing the application of the new legislation, if any, to the case. In a supplemental brief, Salazar argued he was entitled to resentencing pursuant to these amendments to section 1170. In a divided opinion, the Court of Appeal declined to remand for resentencing in light of the new law. (*People v. Salazar* (2022) 80 Cal.App.5th 453, 464 (*Salazar*).) The majority concluded "the record ' "clearly indicate[s]" ' the trial court would not have imposed the low term had it been aware of its discretion to do so under Senate Bill 567." (*Ibid.*) The majority reasoned (1) the probation report identified multiple aggravating factors; (2) the trial court denied Salazar's *Romero* motion and request for probation, highlighting his lengthy criminal history; (3) the trial court imposed consecutive sentences instead of concurrent sentences; (4) "the current offenses were aggravated, sadistic, and extended over the course of 20 hours"; and (5) the trial court imposed a criminal protective order against Salazar and the probation report indicated he had a record of violence against other women. (*Id.* at p. 464; *id.* at p. 463.) In contrast, the dissent would have remanded the case

---

[3]   Senate Bill 567 and Assembly Bill No. 124 (2021–2022 Reg. Sess.) (Stats. 2021, ch. 695) both concerned amendments to section 1170 and were both passed by the Legislature in September 2021 and approved by the Governor and filed with the Secretary of State on October 8, 2021. Senate Bill 567 expressly incorporated Assembly Bill 124 and bears the highest chapter number and so is presumed to be the last of the two approved by the Governor. (Gov. Code, § 9510.)

for resentencing. (*Id.* at p. 466 (dis. opn. of Tangeman, J.).) The dissent believed the record is not clear that the court would have found " 'the aggravating circumstances outweigh the mitigating circumstances [so] that imposition of the lower term would be contrary to the interests of justice.' " (*Ibid.*) The dissent noted that by selecting the middle term, "the trial court impliedly found the aggravating factors were not sufficient to warrant imposition of the high term." (*Ibid.*) The dissent concluded that the "majority's approach of substituting its judgment for that of the trial court contravenes our Supreme Court's holding that remand is required 'unless the record "clearly indicate[s]" that the trial court would have reached the same conclusion "even if it had been aware that it had such discretion." ' " (*Ibid.*) We granted review.

## II. Discussion

The Attorney General argues that the record clearly indicates that the trial court would have imposed the same middle term sentence even if it had been aware of the current section 1170 lower term presumption. We disagree.

" 'Defendants are entitled to sentencing decisions made in the exercise of the "informed discretion" of the sentencing court. (See *United States v. Tucker* (1972) 404 U.S. 443, 447 [30 L.Ed.2d 592, 596, 92 S.Ct. 589]; *Townsend v. Burke* (1948) 334 U.S. 736, 741 [92 L.Ed. 1690, 1693, 68 S.Ct. 1252].) A court which is unaware of the scope of its discretionary powers can no more exercise that "informed discretion" than one whose sentence is or may have been based on misinformation regarding a material aspect of a defendant's record.' (*People v. Belmontes* (1983) 34 Cal.3d 335, 348, fn. 8 [193 Cal.Rptr. 882, 667 P.2d 686].) In such circumstances, we have held that the

appropriate remedy is to remand for resentencing unless the record 'clearly indicate[s]' that the trial court would have reached the same conclusion 'even if it had been aware that it had such discretion.'" (*Gutierrez, supra*, 58 Cal.4th at p. 1391; accord, *People v. Mataele* (2022) 13 Cal.5th 372, 437; *People v. Flores* (2020) 9 Cal.5th 371, 431–432 (*Flores*).)

In *Gutierrez*, we disapproved case law establishing a presumption in favor of life without parole for juveniles convicted of special circumstance murder. (*Gutierrez, supra*, 58 Cal.4th at p. 1390.) We had consolidated two cases under review on our own motion. (*Id*. at p. 1361.) We then remanded the two cases for resentencing, even though the trial courts in each case had made statements indicating that life without parole was the appropriate sentence. (*Id*. at p. 1364 [noting the trial court's statement that defendant Moffett's actions and criminal history "'do not support, in my opinion, this Court exercising [its] discretion and sentencing him to a determinate term of twenty-five years to life. I do not find that sentence appropriate in this particular case under the circumstances of this case'"]; see *id*. at p. 1367 [noting the other trial court's statement, regarding defendant Gutierrez's sentence, that it was "'absolutely convinced at this stage of the proceedings that life without the possibility of parole is the only thing that the Court can do that could redress the amount of violence that was inflicted in this case'"].) We reasoned that, while "the trial courts in these cases understood that they had some discretion in sentencing, the records do not clearly indicate that they would have imposed the same sentence had they been aware of the full scope of their discretion. Because the trial courts operated under a governing presumption in favor of life without parole,

we cannot say with confidence what sentence they would have imposed absent the presumption." (*Id.* at p. 1391.)

The Court of Appeal here emphasized that "[t]he California Constitution admonishes our appellate judiciary not to reverse any trial court judgment unless there has been a miscarriage of justice.  There should only be a reversal where it is reasonably probable that a more favorable outcome will result upon reversal.  (Cal. Const., art. VI, § 13; *People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243] . . . .)"  (*Salazar*, *supra*, 80 Cal.App.5th at p. 462.)  However, the Court of Appeal was mistaken to suggest that *Watson* provides the applicable standard.  Indeed, "there is a practical difference in assessing the effect of an error when the court has not articulated whether a discretionary decision was made in the first place, as compared to when there were errors in a decision the court actually rendered."  (*In re F.M.* (2023) 14 Cal.5th 701, 716.)  Where, as here, the sentencing court was not aware of the scope of its discretionary powers at sentencing, *Watson* does not properly take into consideration the "more speculative inquiry" of what choice the court is likely to make in the first instance.  (*Ibid.*; accord, *People v. McDaniels* (2018) 22 Cal.App.5th 420, 426.)  Indeed, when the applicable law governing the defendant's sentence has substantively changed after sentencing, it is almost always speculative for a reviewing court to say what the sentencing court would have done if it had known the scope of its discretionary powers at the time of sentencing.  Accordingly, when, as here, a sentencing court was not fully aware of the scope of its discretionary powers, "the appropriate remedy is to remand for resentencing unless the record 'clearly indicate[s]' that the trial court would have reached the same conclusion 'even if it had been aware that it had such discretion.' "

(*Gutierrez*, *supra*, 58 Cal.4th at p. 1391; see also *People v. Banner* (2022) 77 Cal.App.5th 226, 242; *People v. Gerson* (2022) 80 Cal.App.5th 1067, 1096; *People v. Fuller* (2022) 83 Cal.App.5th 394, 400.)[4]

Here, the sentencing court did not clearly indicate that it would have imposed the same sentence even if it had been aware of the scope of its discretionary powers under the current section 1170. The Attorney General concedes that the record supports that Salazar may have suffered a qualifying trauma that would meet the statute's threshold requirement for triggering the lower term presumption.[5]  (See *Frahs*, *supra*, 9 Cal.5th at

---

[4]  The Court of Appeal further found that our court's order in *People v. Flores* (2022) 75 Cal.App.5th 495, "denying the request for depublication and review is a cue that *Flores* is the standard governing appellate review." (*Salazar*, *supra*, 80 Cal.App.5th at p. 465.)  To the contrary, and as we have reiterated, an order granting or denying a petition for review or granting or denying a request for depublication is not an expression of opinion on the merits of the case. (See *Camper v. Workers' Comp. Appeals Bd.* (1992) 3 Cal.4th 679, 689, fn. 8; Cal. Rules of Court, rule 8.1125(d).)

[5]  The Attorney General argues that drug addiction, mental health issues, or death of a parent may not qualify as "trauma" within the meaning of the current section 1170, subdivision (b)(6)(A).  The Attorney General also argues that, given the thorough presentation that was already made in this case, Salazar would likely not have presented further evidence of qualifying trauma if the amended statute had been in effect at the time of his sentencing.  We do not reach these issues here because the Attorney General concedes there is at least an affirmative indication in the record that Salazar may have suffered a qualifying trauma and that such qualifying trauma may have been a contributing factor to the offense.

pp. 638–640.) Instead, the Attorney General argues that the record clearly indicates that even if the sentencing court was aware that it was required to impose the lower term unless "the aggravating circumstances outweigh the mitigating circumstances [so] that imposition of the lower term would be contrary to the interests of justice" (§ 1170, subd. (b)(6)), it still would have refused to impose the lower term. We disagree.

First, the Attorney General points to Salazar's "long and continuous criminal history," that includes six additional offenses after the commission of the present offenses. The Attorney General also cites to the particularly aggravated facts of the present case, including the fact that Salazar repeatedly struck the victim and sprayed her with pepper spray over a prolonged period, causing her significant injuries. However, even though the offenses in this case were certainly abhorrent and the sentencing court did note Salazar's "long and continuous criminal history," this does not constitute a clear indication that it would have imposed the middle term under the new law.

Under the former law, section 1170 vested the court with "sound discretion" to simply weigh circumstances in aggravation or mitigation, and any other relevant factors, and then impose any of the three prescribed terms (low, middle, or high) it found to "best serve[] the interests of justice." (§ 1170, former subd. (b).) The new law dramatically restrains that discretion to impose the middle or upper term, now *requiring* the court to impose the lower term if a qualifying trauma was a contributing factor in the commission of the offense "unless the court finds that the aggravating circumstances outweigh the mitigating circumstances [so] that imposition of the lower term would be contrary to the interests of justice." (§ 1170, subd. (b)(6).) Accordingly, under the new law, the presumption is that the

court "*shall* order imposition of the lower term" whenever the defendant has a qualifying trauma. (*Ibid.*, italics added.)

Here, the facts that the offenses were violent and occurred over an extended period and that the sentencing court noted Salazar had an extensive criminal history does not suffice to provide a clear indication the court would have departed from this presumptive lower term in the "interests of justice." (§ 1170, subd. (b)(6).) With respect to the nature of the crime, it is notable that the sentencing court did not even mention the nature of the crime as part of its sentencing determination, other than to agree that the People's estimate that the crime lasted "20 hours is probably pretty accurate."[6] The Court of Appeal stated that the current offenses were "aggravated, sadistic" and "akin to torture." (*Salazar*, *supra*, 80 Cal.App.5th at p. 464.) However, the sentencing court never made any similar statements about the nature of the crime and the Court of Appeal may not substitute its own view of the offenses for the sentencing court's in determining whether remand is appropriate.

As to Salazar's criminal history, though the sentencing court referenced his extensive criminal history, it also noted several mitigating factors in conjunction with that history. As mentioned above, the sentencing court found that "a lot" of Salazar's criminal history "is drug related, and a lot of it may be because of suffering from your father's death, and then I think it was a couple years later, your mother's death." The

---

[6] Furthermore, the court's reference to "20 hours" was not even made in reference to determining which term to impose. Instead, the comment was made in connection with Salazar's request to stay his false imprisonment conviction.

sentencing court further praised Salazar's courtroom conduct, explaining: "You presented yourself very well. You could not have been more respectful, both to your counsel and to [the prosecutor] and to me and to the jury." The court explained that it was "hopeful that once this is done, that you can become the best version of yourself, like your sister is indicating." The court added that "it seems to me like you have more that you could offer." The Attorney General concedes that the parties and the court below all acknowledged that Salazar's "criminality appeared to be primarily bound up with his drug addiction and mental health issues, and possibly the effects of losing his parents several years before the current offenses." Notably, under the former law the sentencing court had "sound discretion" (§ 1170, former subd. (b)) to impose any term, but did not use that "sound discretion" (*ibid*.) to impose an upper term.[7]

This is simply not the kind of record upon which we can conclude that there is a clear indication that the sentencing court would have exercised its discretion under the current section 1170 to impose the same middle term as before. Here, the court emphasized how drug use affected Salazar's criminal history, underscored the impact that Salazar's parents' deaths had on him, noted how respectful Salazar had been in court, and expressed hope that he would have an opportunity for rehabilitation and become the best version of himself. On this

---

[7] We have granted review in *People v. Lynch* (May 27, 2022, C094174) (nonpub. opn.), review granted August 10, 2022, S274942, to decide what prejudice standard applies on appeal when determining whether a case with an upper term sentence should be remanded for resentencing under Senate Bill 567. We do not address that issue here.

record, we cannot say that simply because the sentencing court made a cursory reference to the extended duration of the crime and mentioned Salazar's long criminal history that this provides a clear indication that the court would have concluded that "the aggravating circumstances outweigh the mitigating circumstances [so] that imposition of the lower term would be contrary to the interests of justice." (§ 1170, subd. (b)(6).)[8]

The Attorney General next argues that we can glean a clear indication of the sentencing court's intent from its denial of Salazar's *Romero* motion. However, a *Romero* motion, which is utilized by defendants facing a prison sentence under California's Three Strikes law, requires the sentencing court to utilize a different legal standard with a different presumption than would be applied under the current section 1170. " '[T]he Three Strikes law does not offer a discretionary sentencing choice, as do other sentencing laws, but establishes a sentencing requirement to be applied in every case where the defendant has at least one qualifying strike, unless the sentencing court

---

[8]    The Court of Appeal concluded that "[a]s a matter of law, (1) the aggravating circumstances are overwhelming and outweigh any theoretical mitigating circumstances, and (2) selection of the low term would be 'contrary to the interests of justice.' "    (*Salazar*, *supra*, 80 Cal.App.5th at p. 464.) Discretionary sentencing decisions, such as whether "the aggravating circumstances outweigh the mitigating circumstances [so] that imposition of the lower term would be contrary to the interests of justice" (§ 1170, subd. (b)(6)) are reviewed for an abuse of discretion. (See, e.g., *People v. Sandoval* (2007) 41 Cal.4th 825, 847; *People v. Williams* (1998) 17 Cal.4th 148, 162 (*Williams*).) For the reasons detailed above, it would not be an abuse of a trial court's broad sentencing discretion to leave Salazar's sentence unchanged, nor for it to grant Salazar the benefit of the recent ameliorative legislation.

"conclud[es] that an exception to the scheme should be made because, for articulable reasons which can withstand scrutiny for abuse, this defendant should be treated as though he actually fell outside the Three Strikes scheme." ' " (*People v. Carmony* (2004) 33 Cal.4th 367, 377.)  In ruling on a *Romero* motion, the court must consider whether "the defendant may be deemed outside the scheme's spirit, in whole or in part, and hence should be treated as though he had not previously been convicted of one or more serious and/or violent felonies." (*Williams*, *supra*, 17 Cal.4th at p. 161.)  Thus, the Three Strikes law establishes a "strong presumption" in favor of a harsher sentence and requires the court to explicitly articulate its reasoning if it is to depart from a harsher sentence by granting the *Romero* motion.  (*Carmony*, at p. 378.)  In contrast, the current section 1170 does just the opposite: In cases where the defendant can establish certain qualifying attributes, such as psychological, physical, or childhood trauma that contributed to the offense, the statute now creates a presumption in favor of a more lenient, lower term sentence.  This lower term presumption under section 1170 can then only be departed from if "the aggravating circumstances outweigh the mitigating circumstances [so] that imposition of the lower term would be contrary to the interests of justice."  (§ 1170, subd. (b)(6).)  As explained in *People v. Bell* (2020) 47 Cal.App.5th 153, "[a]s for the court's statement about [the defendant's] *Romero* motion, it is only a 'clear indication' of its views on *that particular* sentencing decision.  We cannot speculate from the court's statements and decision as to one sentencing issue to divine what the court would have done if it had broadened discretion on another sentencing issue."  (*Id.* at p. 200.)  Accordingly, the fact that the sentencing court denied Salazar's *Romero* motion

17

tells us little about what it would have done if given the opportunity to exercise its discretion on another sentencing issue under the current section 1170.

The Attorney General also argues that the sentencing court's rejection of Salazar's request to impose concurrent sentences on the false imprisonment and inflicting corporal injury charges and the court's corresponding statement provide a clear indication that it would have imposed the middle term even if it had been aware of its discretion under the current section 1170. However, a review of the record again shows that the sentencing court was focused on a very different inquiry here. The sentencing court's statement that it was imposing consecutive sentences "[b]ased on everything that I've said" appears to refer to its denial of Salazar's request to stay sentencing on the false imprisonment conviction because "there were breaks" between offenses, rather than "an ongoing singular continuous course of conduct." In deciding whether to impose consecutive sentences, the sentencing court here, consistent with well-settled law, was considering whether the "crimes were committed at different times or separate places, rather than being committed so closely in time and place as to indicate a single period of aberrant behavior." (Cal. Rules of Court, rule 4.425(a)(3).) The court's decision to impose consecutive sentences based upon its determination that the conduct at issue was not continuous is a wholly distinct inquiry from whether a lower term would be contrary to "the interests of justice." (§ 1170, subd. (b)(6).)

The Attorney General responds by noting that because the sentencing court may also consider aggravating circumstances as part of its decision to impose consecutive sentences, this " 'clearly indicate[s]' " that it would not have

imposed the lower term under the current section 1170. (*Gutierrez, supra,* 58 Cal.4th at p. 1391; see Cal. Rules of Court, rule 4.425.) "In deciding whether to impose consecutive terms, the trial court may consider aggravating and mitigating factors." (*People v. Black* (2007) 41 Cal.4th 799, 822.) However, "there is no requirement that, in order to justify the imposition of consecutive terms, the court find that an aggravating circumstance exists." (*Ibid.*; see also Cal. Rules of Court, rule 4.425.) Thus, the sentencing court is not required to find that *any* aggravating circumstances exist before imposing consecutive sentences and, notably, the court here did not specifically articulate any aggravating circumstances in conjunction with its imposition of consecutive terms. By contrast, under section 1170, in order to depart from the lower term after the lower term presumption is triggered, the court must make a specific finding that "the aggravating circumstances outweigh the mitigating circumstances [so] that imposition of the lower term would be contrary to the interests of justice." (§ 1170, subd. (b)(6).) Consequently, the court's decision to impose consecutive sentences cannot be a clear indication of its intent to impose the middle term under the current section 1170.[9]

---

[9]     In finding a clear indication of the sentencing court's intent, the Court of Appeal also relied upon the facts that the sentencing court imposed a criminal protective order against Salazar and the probation report indicated he had a record of violence against other women. However, the Attorney General does not rely upon these facts, and for good reason. The sentencing court made no mention whatsoever of the record of violence against women and the court merely recited the terms of the protective order without any explanation as to why a

Finally, the Attorney General argues that a clear indication of the sentencing court's intent is shown by the statement that "I'm going to select not the high term, but the mid term, and that's based on having heard the evidence, and based on the fact that the last seven years or so, the defendant's criminal history has been drug related." The Attorney General emphasizes that the court did not indicate here or elsewhere that it was contemplating the lower term as an appropriate sentence. However, the court never had the opportunity to consider the new lower term presumption for qualifying offenders. The fact that the court did not expressly indicate that it was considering imposing the lower term reveals very little, as the newly enacted presumption in favor of the lower term did not exist at the time of Salazar's sentencing. In *Gutierrez* we remanded the cases for resentencing even though the sentencing courts made statements indicating that a lengthier sentence was appropriate. (*Gutierrez*, *supra*, 58 Cal.4th at pp. 1364, 1367.) In fact, we remanded in *Gutierrez* even though the sentencing court provided a much more forceful justification for imposing a lengthy sentence than the sentencing court did here. (See *id.* at p. 1367 [the sentencing court stated it was " 'absolutely convinced' " that life without the possibility of parole was " 'the only thing that the Court can do that could redress the amount of violence that was inflicted in this case' "].) The Attorney General's framing here would flip the "clearly indicate" standard on its head: the sentencing court's mere silence about whether it was considering the lower term cannot constitute a clear indication that it would not have imposed a

protective order was being imposed. These facts do little to impart a clear indication from the sentencing court.

20

lower term even if it were applying the new law. If anything, "[b]y selecting the middle term [under the former law], the trial court impliedly found the aggravating factors were not sufficient to warrant imposition of the high term." (*Salazar*, *supra*, 80 Cal.App.5th at p. 466 (dis. opn. of Tangeman, J.).)

Indeed, the record is very different from the circumstances in which we have previously found a clear indication that the sentencing court would have imposed the same sentence had it been aware of the scope of its discretionary powers. For example, in *Flores*, the sentencing court stated, " 'I think Mr. Flores does fall into the category of the worst of the worst offenders thereby deserving the ultimate sentence of death.' " (*Flores*, *supra*, 9 Cal.5th at p. 432.) The sentencing court noted the defendant, " 'show[ed] absolutely no remorse'; '[i]t's as if he has no soul.' " (*Ibid*.) In the sentencing court's " 'opinion[,] justice will be served' by a death sentence." (*Ibid*.) Given that the sentencing court explicitly said it thought it " 'just[ ]' " for the defendant to receive a death sentence — "the most severe sentence available under California law" — we found it clear the sentencing court would not have exercised its newly conferred discretion to eliminate firearm enhancements " 'in the interest of justice.' " (*Ibid*.) However, we emphasized that "[w]e express no opinion" on the utility of remand in light of the newly conferred discretion to eliminate firearm enhancements "where the record shows the trial court approved of a high sentence short of the death penalty." (*Id*. at p. 432, fn. 16.) *Flores* is thus distinct from the present case, which does not involve a death sentence and where the sentencing court's comments are not at all comparable to those in *Flores*. This case also does not present the circumstances in which the sentencing court announces that it is aware of forthcoming legislation and then explains how it

would exercise its discretion under that legislation. The sentencing court's statements here do not provide this type of clear indication of intent.

In sum, in *Gutierrez*, we established that when a court has not exercised its informed discretion, remand is the default "unless the record 'clearly indicate[s]' that the trial court would have reached the same conclusion 'even if it had been aware that it had such discretion.'" (*Gutierrez*, *supra*, 58 Cal.4th at p. 1391.) We emphasize that principle again: unless there is a clear indication from the sentencing court that it would be idle to do so, remand for resentencing is required. When the applicable law governing the defendant's sentence has substantively changed after sentencing, it is almost always speculative for a reviewing court to say what the sentencing court would have done if it had known the scope of its discretionary powers at the time of sentencing. Mere reliance on the length of the original sentence and attendant decisions, such as imposing consecutive sentences, imposing middle or upper term sentences, or declining to strike enhancements, is not sufficient to provide a clear indication of what a sentencing court might do on remand if it had been fully aware of the scope of its discretionary powers. (See, e.g., *People v. Almanza* (2018) 24 Cal.App.5th 1104, 1110–1111.) Given the Attorney General's concession that there is at least an affirmative indication in the record that Salazar may have suffered a qualifying trauma and that such qualifying trauma may have been a contributing factor to the offense; given that the sentencing court expressly referenced various mitigating factors in its ruling; and given that the sentencing court declined to impose the high term, we find no clear indication that the sentencing court would impose the same sentence even under the new law. The current section

1170 is an ameliorative law that *requires* the sentencing court to impose the low term in cases where a qualifying trauma contributed to the offense and permits the sentencing court to depart from the lower term only in specific circumstances. This is a marked departure from the prior law under which Salazar was sentenced. The record must, accordingly, be clear before a reviewing court declines to remand and precludes the sentencing court from exercising discretion that it never knew it had. On this record, "we cannot say with confidence what sentence [the court] would have imposed" if it were applying Senate Bill 567 in the first instance. (*Gutierrez*, at p. 1391.) The Legislature has created a procedure for a defendant to seek resentencing and the parties agree that Salazar, whose case is not yet final on appeal, is entitled to its application in this case. Having reviewed the record under the standard enunciated in *Gutierrez*, we conclude the appropriate remedy is to remand the matter to allow the sentencing court to exercise its discretion in the first instance. We express no view as to how the court should resolve that question.

## III. Disposition

We reverse the judgment of the Court of Appeal and remand the case to the Court of Appeal with instructions to remand the case to the superior court for resentencing.

**GROBAN, J.**

**We Concur:**

**GUERRERO, C. J.**
**CORRIGAN, J.**
**LIU, J.**
**KRUGER, J.**
**JENKINS, J.**
**EVANS, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  People v. Salazar

---

<u>**Procedural Posture**</u> (see XX below)
**Original Appeal**
**Original Proceeding**
**Review Granted (published)** XX 80 Cal.App.5th 453
**Review Granted (unpublished)**
**Rehearing Granted**

---

**Opinion No.** S275788
**Date Filed:**  November 20, 2023

---

**Court:**  Superior
**County:**  Ventura
**Judge:**  Anthony J. Sabo

---

**Counsel:**

Arielle Bases, under appointment by the Supreme Court, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Chung L. Mar, Steven D. Matthews and David F. Glassman, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Arielle Bases
Bases & Bases, APC
16633 Ventura Boulevard, Suite 500
Encino, CA 91436
(818) 905-1144

David F. Glassman
Deputy Attorney General
300 South Spring Street
Los Angeles, CA 90013
(213) 269-6207