Filed 2/13/25  P. v. Lukata CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B334459 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. LA087903) |
| v. | |
| ANTHONY LUKATA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Michael V. Jesic, Judge.  Affirmed.

Susan Morrow Maxwell, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Xiomara Costello and Gabriel Bradley, Deputy Attorneys General, for Plaintiff and Respondent.

———————————

# INTRODUCTION

Anthony Lukata appeals from a judgment sentencing him to 12 years in state prison, comprised of the upper term of 11 years for voluntary manslaughter plus one year for a weapons use enhancement. Lukata contends the trial court abused its discretion at sentencing because it relied on facts not found by the jury and ignored the presumption in favor of the lower term sentence. We conclude the trial court did not abuse its discretion and affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A.    *Background*

On November 18, 2017, Lukata beat Roderick White with a crowbar and stabbed him multiple times with a knife. White died from his injuries. On November 29, 2017, White's body was discovered in the desert in Kern County wrapped in a garbage bag. Lukata was arrested on February 22, 2018. Lukata confessed to the crime at trial.

White was killed in a home in Reseda owned by Yocasta Maldonado, whom Lukata had been told had connections to a Mexican drug cartel. Maldonado lived in the home with her boyfriend Jose Chaidez, her tenant Jordan James, and her brother-in-law Anthony Nava. Maldonado and Nava helped clean the crime scene and dispose of the body. Each pleaded guilty to being an accessory after the fact.[1]

---

[1]    In January 2016, Maldonado was arrested for transporting cocaine across the border. By November 2017, she was awaiting

Lukata was charged with White's murder (Pen. Code, § 187, subd. (a)).[2] The information further alleged Lukata personally used a deadly or dangerous weapon, a knife and a crowbar, to commit the offense (§ 12022, subd. (b)(1)). The following circumstances in aggravation were also alleged: the crime involved great violence, great bodily harm, or other acts disclosing a high degree of cruelty, viciousness, or callousness; Lukata was armed with or used a weapon, a knife, at the time of the commission of the crime; the victim was particularly vulnerable; Lukata induced others to participate in the commission of the crime and occupied a position of leadership; Lukata engaged in violent conduct in committing the offense that indicates a serious danger to society; and Lukata lacked remorse. (Cal. Rules of Court, rules 4.408, 4.421(a)(1), (2), (3), (4), (b)(1) & (c).)

B.    *Trial*

At trial, the prosecution presented testimony from Maldonado, Chaidez, James, and Nava, among others, regarding the killing.

Lukata testified on his own behalf. He was born in Belgium and lived there until he was 15 years old, when he came to the United States. He was married to his second wife and had three children with his ex-wife. Several years before White's killing, Lukata learned his middle child had been sexually

sentencing and was on pretrial release for that crime. She served 18 months in county jail in this case and served 37 months in federal prison for the federal crime.

[2]    All further references are to the Penal Code unless otherwise specified.

3

abused by his ex-wife's relatives from age five to eight or nine. Lukata believed he had failed his child and began to drink heavily and to use cocaine as a result.

Lukata worked for many years with children with moderate to severe disabilities in a program within the Los Angeles Unified School District. There, he met Jake DiGennaro, who had the expressive language of a two-year-old. Lukata developed a friendly relationship with him. Jake's father hired Lukata to serve as his caretaker when Jake aged out of the program in 2013. By 2017, Lukata had known Jake for more than 15 years and felt Jake was part of his family. Jake went on vacations with Lukata and his family, slept over, and attended family functions.

Lukata was not scheduled to look after Jake on November 17, but Jake's father had a medical emergency and asked Lukata to pick up Jake. That afternoon, Lukata brought Jake to Maldonado's house. Lukata began to drink and use cocaine.

Lukata also invited White to Maldonado's house that day. The two had met at the club where Lukata worked as a bouncer. They became close friends. White also drank at the house and Lukata suspected White was high on something.

Three or four hours after he arrived, Lukata noticed Jake had been in the bathroom for a long time. He went to check on Jake and found White was also inside the bathroom, standing in front of the door. Lukata saw White had an erection with his underwear down. Jake was sitting on the toilet with his pants and underwear down. He had his fingers in his ears and he kept repeating, "Goodbye." White told Lukata that he needed to use the restroom, pulled up his underwear, and pushed past Lukata

4

to leave the bathroom. Lukata helped Jake off the toilet, pulled up his pants and underwear, and led him out of the bathroom. They encountered Cassandra Nava, Anthony Nava's sister, in the hallway and Lukata asked her to look after Jake.

Lukata testified he became enraged, thinking of his own child and the other children with whom he worked who had been sexually abused. Lukata picked up a crowbar that was next to the entryway, followed White to the living room, and hit him on the head five or six times with it. Lukata ordered White to take off his pants and White complied. Lukata then continued to beat White from room to room with his fists, elbows, and legs, having left the crowbar in the living room. Lukata had extensive training in martial arts and estimated he weighed 260 pounds at the time and was heavier than White. White attempted to get away from Lukata but was unsuccessful. The fighting stopped briefly when the men stumbled into the backyard, and Maldonado screamed there was a police officer who lived next door and they were bringing attention to her house. Lukata and White retreated to the kitchen and the garage. In the kitchen, Lukata began hitting White again, knocking him to the floor unconscious.

Believing White had died, Lukata went to the living room where he cried and drank and used cocaine for 30 to 40 minutes. Lukata returned to the kitchen when he heard White calling him. Lukata testified he was relieved White was not dead and returned to the kitchen to help White. When Lukata extended his hand to help White off the floor, White began to stab him with a kitchen knife. The jury was shown photographs of injuries

suffered by Lukata on his arms and hands.[3]  Lukata managed to take the knife from White and stabbed him over 10 times in the face, head, and torso.  After Lukata heard White's last breaths, he cleaned up in the bathroom.

Lukata left Maldonado's home the morning of November 18, 2017, and took Jake with him in Nava's car.  Lukata returned to Maldonado's home that afternoon and helped Nava wrap White's body in plastic and duct tape.  Nava drove away with the body.

After that, Lukata walked to a nearby 7-Eleven.  The clerk activated the store's silent alarm because Lukata was acting erratically.  Responding officers observed him behind the counter.  When he failed to comply with the officers' orders, they tased him.  While they were taking him into custody, Lukata told the officers he killed someone and made other incriminating statements that were recorded on the officers' body-worn cameras.  When officers questioned Lukata about his statements, Lukata testified he acted "paranoid" because he believed the officers were members of the cartel.  The officers transported him to the hospital.  By then, Lukata had been awake for three days, drinking and using more cocaine than he ever had before.  Lukata was admitted to the hospital and remained there for three days.  Lukata pleaded guilty to a misdemeanor charge of disturbing the peace in connection with his arrest at the 7-Eleven.

On November 24, 2017, James, Maldonado's tenant, reported White's death to the police and told them he was killed

---

[3]     The photographs were taken by the police officers who took Lukata into custody the next morning, as described below.

6

in Maldonado's house.[4]  Criminalists conducted a search of Maldonado's house and discovered White's DNA in blood stains found on the couch, on the fence in the backyard, and in the garage.

At trial, the People presented evidence that Lukata had other reasons to kill White.  He told Maldonado and Nava that White owed him money or cheated him out of a gram of cocaine.  Nava also testified Lukata wanted to make more money for his family and believed he could work for the cartel by impressing Maldonado with his fighting skills.  The People disputed Lukata's testimony that he killed White because White attacked him with a knife, and he was afraid for his life.

In addition to his own testimony, Lukata presented testimony from Jake's father, as well as others, that he was known as a peaceful person.  A custody deputy with the Los Angeles County Sheriff's Department who had almost daily contact with Lukata during his four-year pretrial incarceration testified for the defense.  The custody deputy testified Lukata did not fight during his four years there and often attempted to deescalate violent situations as they were developing.  Defense

---

[4]     Multiple people were present at Maldonado's home at various times on the day White died.  We do not detail each witness's testimony unless necessary to our discussion of this case.  The witnesses generally testified to observing blood on the furniture, walls, and ceiling.  Maldonado observed Lukata beating White at different times.  Chaidez and Cassandra Nava testified they took Jake, who was upset, out of the house when the fight began and brought him back in the morning.  No eyewitness testified they observed White in the bathroom with Jake.  Nor did anyone testify they saw White attack Lukata with a knife.

counsel argued to the jury that Lukata was provoked by what he saw in the bathroom, and "[t]he worst that this is, is voluntary manslaughter." Defense counsel nevertheless urged the jury to find Lukata not guilty under a theory of self-defense because White attacked him with a knife.

The jury found Lukata guilty of voluntary manslaughter (§192, subd. (a)). The jury found true the special allegation that Lukata personally used a knife to commit the offense (§ 12022, subd. (b)(1)). The jury also found true two aggravating factors: that Lukata personally used a knife and engaged in great violence, great bodily harm, threat of great bodily harm, or other acts disclosing a high degree of cruelty, viciousness, or callousness (Cal. Rules of Court, rules 4.421(a)(1) & 4.421(a)(2)).

C.    *Sentencing*

Defense counsel submitted a sentencing memorandum arguing for a lower term sentence, pointing to Lukata's significant childhood trauma and the trauma resulting from learning of the sexual abuse suffered by his child. In support, defense counsel submitted an investigator's report of an interview with Lukata's younger brother, who described the physical abuse and neglect suffered by the brothers when they were young. Alternatively, defense counsel urged the court to impose the midterm as the maximum sentence due to several factors in mitigation pursuant to California Rules of Court, rule 4.423: White provoked the incident, the crime was committed because of great provocation that is unlikely to recur, and Lukata had no prior record, was addicted to alcohol and cocaine at the time of the incident, and had participated in rehabilitative programs while in pretrial detainment. The

8

defense presented letters from two jurors in the case who asked for leniency in sentencing Lukata. The People urged the court to impose the upper term because the crime involved great violence and a high degree of cruelty.

At the September 29, 2023 sentencing, the court heard victim impact statements from White's mother, sister, and brother, who traveled from New York to appear personally. Additional White family members attempted to appear remotely from the East Coast to speak but were unable to do so due to technical difficulties.

In imposing its sentence, the court explained:

"This is a very, very unusual case, probably one of the most unusual I've ever had. I've never had jurors come back to court. I've never had a deputy testify in a trial.

"Prior to becoming a judge I was a gang prosecutor for almost my entire career, probably handled, between being a prosecutor and a judge, well over one hundred murders, and I've never seen anything like this. I've never seen the kind of viciousness and cruelty that the defendant put the victim under that day. I'm rarely—I'm never shocked anymore because I've seen so much. This case truly shocked me.

"I'll tell you this, I find that the aggravating circumstances completely outweigh any mitigating circumstances in this case, and it justifies the high term based on the acts the defendant committed that day, stabbing the victim I can't remember how many

9

times, after he had already broken both orbital bones, I believe, and his nasal bone.  He had left the victim to die.  And when he realized the victim wasn't dead, he finished him.  He had already said he'd calmed down, but he finished him.

"I didn't buy the story about him having to defend himself, and that the victim had a knife, because the victim was out cold on the floor.  He never had a chance to get up and get the knife.  He was lying there until he started moaning, and the defendant came over and saw he was still alive, and he finished him.  That's how I saw it.

"The jurors made their decision in this case, and I respect that one hundred percent, and they did their job in this case, exactly what they were supposed to do.  That doesn't change the viciousness with which this crime was committed in terms of the unnecessary torture that the victim was put under that day.

"And I'll say, which this part has nothing to do with my decision on sentencing, I have very little doubt in my mind that what was said on the 7-11 recording was based on the truth in this case, based on how the defendant said it, based on the circumstantial evidence in this case, and again I don't use this for any basis in my sentencing, I just feel that I need to say some things, maybe because this is unusual because I normally don't say anything at this point.

"He, Mr. Lukata, was just like the victim's brother stated.  He was in shock as to everything that happened.  He was under the influence of cocaine and alcohol, and everything started coming out, and this isn't something made up by someone because there's too much in this case that corroborates everything he said that day.  The way he talked about trying to impress Acosta, [sic] the member of the cartel.  The fact that he said over and over again he wanted to make more money.  He set up that victim to be killed, and he did it to a friend of his, which I find even more shocking because he wanted to show that he was worthy to that cartel, and the only regret he has is that he realized the plan backfired when they weren't so impressed.

"I've seen many, many cases in my career, not saying this happened in this case, but many, many cases where the pants were pulled down and everyone seemed to be shocked.  I wasn't.  In every case I ever had, not saying this is the situation here because I don't know what's in the defendant's mind, but that's a telltale sign of the victim with the pants down.  That's what happened in every case I've ever[] seen.

"That's a pretty sophisticated and savvy way of dealing with someone to show to the cartel you're worthy of them trusting you to do their business in the future.  I don't know that that happened, but I've seen in other cases I've had that have dealt with that.  So no, I don't buy the other stuff, I just don't.  I didn't

11

want the defendant to leave without him knowing
how I viewed the evidence in this case."

The trial court then sentenced Lukata to the upper term for the voluntary manslaughter conviction, "based on aggravating factors substantially outweighing any mitigating factors in this case based on everything I said earlier except, and I just want to be clear, except for my own analysis of what the evidence has shown in this case. That's not what I'm basing it on."

The court imposed a 12-year sentence in state prison, comprised of 11 years for voluntary manslaughter plus one year for the weapon use enhancement under section 12022, subdivision (b)(1). By this time, Lukata had been in custody since 2018; he had earned 2,046 days of actual credit plus 306 days of good time work credit for total custody credits of 2,352 days.

Lukata timely appealed.

## DISCUSSION

A.    *Governing Law and Standard of Review*

"Voluntary manslaughter is punishable by imprisonment in the state prison for 3, 6, or 11 years." (§ 193, subd. (a).) "Section 1170, subdivision (b) governs imposition of a judgment of imprisonment when a statute specifies three possible terms." (*People v. Suazo* (2023) 95 Cal.App.5th 681, 704.) Through Senate Bill No. 567 and Assembly Bill No. 124, effective January 1, 2022, the Legislature amended section 1170, subdivision (b), "in several fundamental ways." (*People v. Flores* (2022) 73 Cal.App.5th 1032, 1038.)

Of relevance to this case, section 1170, subdivision (b), was amended "to prohibit imposition of an upper term sentence unless aggravating circumstances justify that term and the facts underlying any such circumstance, other than a prior conviction, 'have been stipulated to by the defendant or have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial.'" (*People v. Lynch* (2024) 16 Cal.5th 730, 742 (*Lynch*), citing Pen. Code, §1170, subd. (b)(1).)

Additionally, "the new statute creates a presumption that the sentencing court 'shall' enter a lower term sentence when, among other things, a 'psychological, physical, or childhood trauma' contributed to the offense. [Citation.] The sentencing court may only depart from this lower term presumption if it finds that the aggravating circumstances outweigh the mitigating circumstances such that the lower term would be contrary to 'the interests of justice.'" (*People v. Salazar* (2023) 15 Cal.5th 416, 419 (*Salazar*), quoting § 1170, subd. (b)(6) & (b)(6)(A).)

"Discretionary sentencing decisions, such as whether 'the aggravating circumstances outweigh the mitigating circumstances [so] that imposition of the lower term would be contrary to the interests of justice' (§ 1170, subd. (b)(6)) are reviewed for an abuse of discretion." (*Salazar, supra*, 15 Cal.5th at p. 428, fn. 8; accord, *People v. Hilburn* (2023) 93 Cal.App.5th 189, 205.) A sentencing court must exercise ""'informed discretion'"" and abuses its discretion when it misunderstands "'the scope of its discretionary powers.'" (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1391.) "'To prove an abuse of discretion, "'[t]he burden is on the party attacking the sentence to clearly show that the sentencing decision was irrational or arbitrary.'"'" (*People v. Fredrickson* (2023) 90 Cal.App.5th 984, 988

(*Frederickson*).) "It is true that nothing in section 1170(b)(2) prohibits the court from imposing an upper term sentence based on a single, properly proven aggravating circumstance *if*, in the court's discretion, *that circumstance alone* justifies a sentence exceeding the middle term." (*Lynch, supra,* 16 Cal.5th at p. 764.)

B.      *The Trial Court Did Not Abuse Its Discretion By Sentencing Lukata to the Upper Term*

Lukata acknowledges that "[t]he [trial] [c]ourt could properly rely on the jury's true finding of the aggravating circumstance pursuant to California Rules of Court, rule 4.421(a)(1) that appellant 'engaged in great violence, great bodily harm, threat of great bodily harm or other acts disclosing a high degree of cruelty, viciousness, or callousness'" to impose the upper term. But he argues the trial court abused its discretion because (1) its comments make clear it also relied on facts not found true by the jury and (2) it ignored the statutory mandate to impose a lower term due to Lukata's psychological, physical, and childhood trauma that contributed to the offense. Lukata has not met his burden to demonstrate the trial court's sentence was irrational or arbitrary. (See *Fredrickson*, *supra,* 90 Cal.App.5th at p. 988.)

First, Lukata points to the court's comments that he "left the victim to die. And when he realized the victim wasn't dead, he finished him. He had already said he'd calmed down, but he finished him. I didn't buy the story about him having to defend himself, and that the victim had a knife, because the victim was out cold on the floor. He never had a chance to get up and get the knife. He was lying there until he started moaning, and the

14

defendant came over and saw he was still alive, and he finished him.  That's how I saw it."

According to Lukata, the court's comments that Lukata had "calmed down" and that it "didn't buy" the self-defense theory demonstrate the court relied on improper facts when sentencing him.  In Lukata's view, through its verdict, the jury implicitly found Lukata had not "calmed down" by the time of the killing and had acted in imperfect self-defense.[5]  But examining the court's comments about the evidence in context, the record confirms the court did not base Lukata's sentence on its "own analysis of what the evidence has shown in this case."  By stating, "That's how I saw it," the court indicated that it viewed the evidence differently from the jury.  But it acknowledged the jury's verdict was to be respected "one hundred percent," and the court's views of the evidence did not bear on the sentence.  The court instead explained that it was expressing its views because "I didn't want the defendant to leave without him knowing how I viewed the evidence in this case."  Lukata has not shown an abuse of discretion based on these facts.  (See *People v. Cruz* (1995) 38 Cal.App.4th 427, 434 [no abuse of discretion where

---

[5]     The court instructed the jury with CALCRIM No. 570:  "If enough time passed between the provocation and the killing for an ordinary person of average disposition to 'cool off' and regain his or her clear reasoning and judgment, then the killing is not reduced to voluntary manslaughter on this basis."

The trial court also instructed the jury with CALCRIM No. 571, which provides in pertinent part:  "A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed a person because he acted in imperfect self-defense."

15

court relied on proper reasons for sentencing choice but also discussed other reasons]; see also *People v. Clark* (1992) 12 Cal.App.4th 663, 667 [remand for resentencing not required where a superior court's remarks discussing improper aggravating or mitigating factors are buttressed by other valid factors and comments indicating a strong belief that the upper term was proper].)

Second, Lukata argues the trial court ignored or misunderstood the presumption for the lower term under amended section 1170, subdivision (b), despite evidence of his psychological trauma. Lukata contends the evidence of his parents' physical abuse and neglect, as well as the trauma he suffered upon discovering his son's sexual abuse were sufficient to trigger the imposition of the lower term.

We are not persuaded that the trial court was unaware of or misunderstood the presumption under section 1170. Lukata acknowledges the court had read and considered his sentencing brief, which specifically directed the trial court's attention to the presumption for a lower term under section 1170, subdivision (b)(6). Reversal is not required under these circumstances. (See *People v. Caparrotta* (2024) 103 Cal.App.5th 874, 905 ["because [defendant] highlighted Penal Code section 1170, subdivision (b)(6) in his sentencing memorandum, we presume that the trial court was aware [defendant] was seeking to benefit from that provision"]; see also *People v. Panozo* (2021) 59 Cal.App.5th 825, 837 [resentencing required where the record is ambiguous as to whether the court was aware of its mandatory obligations under sections 1170.9 and 1170.91 because neither statute was mentioned in the parties' arguments or sentencing memoranda].)

16

In all events, section 1170, subdivision (b)(6), expressly requires the imposition of the lower term if the defendant's psychological, physical, or childhood trauma contributed to the offense "unless the court finds that the aggravating circumstances outweigh the mitigating circumstances [such] that imposition of the lower term would be contrary to the interests of justice." Here, the trial court expressly stated its sentence was "based on aggravating factors substantially outweighing any mitigating factors in this case," impliedly finding imposition of the lower term would be contrary to the interests of justice.[6]

The court emphasized the great violence Lukata exhibited and the high degree of cruelty, viciousness, or callousness in the commission of the homicide. Lukata's own testimony at trial revealed he was the aggressor who initially hit White on the head with a crowbar five or six times. He then beat White from room to room at the Maldonado house using his martial arts training and over a lengthy period of time that included breaks. The eyewitnesses testified to observing blood splatter on the walls and furniture of the house. Criminalists confirmed blood found in the home belonged to White. Maldonado, who witnessed the altercation, testified it was a "beat down," not a fight. Lukata admitted he left White for dead when White fell unconscious to the kitchen floor the first time. Lukata then went back into the kitchen when White began to move and stabbed him multiple times in the face and head. Lukata did not leave the kitchen

---

[6] A trial court is not required to expressly state, using the statutory language, that as a result of weighing the applicable factors, it has concluded that "'imposition of the lower term would be contrary to the interests of justice.'" (*Caparrotta, supra,* 103 Cal.App.5th at p. 906, fn. 14.)

17

until he heard White stop breathing.  Under these circumstances, we cannot conclude the court abused its discretion in determining this aggravating circumstance outweighed the mitigating circumstances presented by Lukata.  (See *Lynch, supra,* 16 Cal.5th at p. 764 [a court may impose the upper term sentence based on a single properly proven aggravating circumstance]; see also *People v. Scott* (1994) 9 Cal.4th 331, 355 [appellate court may not reweigh valid factors bearing on the trial court's sentencing decision]; *People v. Knowles* (2024) 105 Cal.App.5th 757, 770 [declining to reweigh the aggravating and mitigating circumstances ""merely because reasonable people might disagree""].)

## DISPOSITION

The judgment is affirmed.

MARTINEZ, P. J.

We concur:

SEGAL, J.

STONE, J.

18