Filed 10/21/24  P. v. Chacon CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B332577 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. FJ54515) |
| v. | |
| EDGAR CHACON, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Robert Totten, Judge Pro Tempore.  Affirmed.

Laini Millar Melnick, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Chung L. Mar and David E. Madeo, Deputy Attorneys General, for Plaintiff and Respondent.

————————————

Defendant Edgar Chacon challenges the juvenile court's order transferring him to the jurisdiction of the criminal court to stand trial for a murder he is alleged to have committed in 2014, when he was 16 years old. Such an order is permitted only if the juvenile court "find[s] by clear and convincing evidence that the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court" (Welf. & Inst. Code, § 707, subd. (a)(3)).[1] Chacon contends that no substantial evidence supported the juvenile court's finding that he was not amenable to rehabilitation in the limited two-year jurisdictional time frame still potentially available in that court, and we should reverse to keep his case in juvenile court.

Chacon alternatively argues we should remand for further proceedings regarding transfer because after the court issued its ruling, the Legislature enacted Senate Bill No. 545 (2023-2024 Reg. Sess.) (Senate Bill 545) which amended the Welfare and Institutions Code to require juvenile courts to consider factors such as "the existence of childhood trauma" and "the minor's involvement in the child welfare or foster care system" when considering a minor's amenability to rehabilitation. (§ 707, subd. (a)(3)(A)(ii), as amended by Stats. 2023, ch. 716, § 1.) At the time of the ruling in Chacon's case, courts were permitted but not required to take those factors into account. Chacon contends that the new law applies retroactively to his case, and that if it had been in effect when the juvenile court made its ruling, the court might not have transferred his case.

---

[1] Unless otherwise specified, subsequent statutory references are to the Welfare and Institutions Code.

2

We agree Senate Bill 545 is retroactive, but we disagree with Chacon's other arguments.  Substantial evidence supported the juvenile court's decision to transfer Chacon's case to criminal court.  Furthermore, the entirety of the record shows the court did in fact consider the various mandatory factors required by Senate Bill 545 before finding Chacon was not amenable to rehabilitation in the juvenile system.  Because the record " ' "clearly indicate[s]" that the [juvenile] court would have reached the same conclusion' " (*People v. Salazar* (2023) 15 Cal.5th 416, 419, 425) if the amendments to section 707 had been in effect at the time of the hearing, remand for a new hearing is not required.

## FACTUAL BACKGROUND AND PROCEEDINGS BELOW

### A.    The Shooting

The People allege that, on the evening of August 18, 2014, Chacon shot and killed Derrick Owens on a street in South Los Angeles.  Chacon's cousin Daniel H. told police that he and Chacon were members of the Ghetto Boyz street gang, a rival of the Primera Flats gang.  According to Daniel, Chacon was angry that Owens, whom Chacon described as the "Black guy from [Primera] Flats" had disrespected Chacon by waving at Chacon's girlfriend.  The day before the shooting, Chacon texted Daniel asking for a gun, and Daniel told him where he could find a .25 caliber handgun.

A friend of Owens testified at the preliminary hearing that Owens had previously belonged to the Primera Flats gang but had quit the gang life.  On the evening of the shooting, the friend and Owens were walking east on Adams Boulevard when a person the friend later identified as Chacon approached them on a bicycle.  Chacon asked Owens where he was from and if he was

3

from Primera Flats, and Owens said, "Fuck Flats, I ain't from there anymore!" Chacon then pulled a gun from his waistband and fired twice, hitting Owens in the chest.

Daniel told police that Chacon later told him that he used "the toy on the tinto from Primera Flats." A police detective testified that "toy" is commonly used in gang culture to mean gun, and that "tinto" is a slang term referring to a Black person. Owens was Black.

Police recovered two empty casings from a .25 caliber pistol at the scene. An autopsy determined that Owens was shot once in the chest and once on his left flank. The first shot perforated Owens's heart and was immediately life-threatening.

Approximately two months later, police detectives found freshly painted graffiti near the scene of the shooting reading "GBZ Kid Skips" and "PF 187." According to police, "Kid" is one of Chacon's gang monikers, "Skips" is Daniel H.'s moniker, and "PF 187" referred to the murder of a Primera Flats member (with PF signifying Primera Flats and 187 the Penal Code section for murder).

## B.    Court Proceedings

The People initially charged Chacon as an adult. In 2016, while the case was pending, voters enacted Proposition 57, which "eliminated a district attorney's ability to 'direct file' charges in criminal court against minors who were 14 years of age or older at the time of their alleged crimes. Instead, Proposition 57 requires a district attorney to obtain juvenile court approval before prosecuting minors in criminal court." (*People v. Superior Court (Alexander C.)* (2019) 34 Cal.App.5th 994, 997.)

In January 2017, the case was remanded to juvenile court, where the People filed a petition under section 602 alleging that

4

Chacon came within the jurisdiction of the juvenile court as a result of the murder. The People also filed a motion under section 707 for the court to transfer Chacon back to criminal court.

At a hearing on the transfer motion, several juvenile hall employees and volunteers testified that Chacon had behaved well there and made strides toward rehabilitating himself. In addition, Chacon introduced psychologist reports that described a difficult childhood and suggested that Chacon suffered from attention deficit hyperactivity disorder, posttraumatic stress disorder, depression, and substance abuse. The juvenile court noted that Chacon's "life was filled with assaults, abandonment, [and] abuse," such that "none of us are surprised [it led to] [Chacon] gravitating towards gangs and violence." In addition, the court recognized that "[Chacon] performed in an exemplary manner" in juvenile hall programming, and concluded that "he's a salvageable young man" who could be rehabilitated before the juvenile court lost jurisdiction. Nevertheless, because Chacon's alleged actions in committing the murder showed sophistication, and the offense itself was "a cold, callous, heartless act" with no apparent mitigating factors, "the People . . . met their burden" to prove that transfer to criminal court was appropriate.

On January 1, 2023, while Chacon's case remained pending in criminal court, Assembly Bill No. 2361 (2021-2022 Reg. Sess.) (Assembly Bill 2361) became effective. (Stats. 2022, ch. 330.) The law amended section 707 to require the court to "find by clear and convincing evidence that the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court" before transferring a minor to adult criminal court. (§ 707, subd. (a)(3).) In light of the new law, the criminal court transferred

5

Chacon back to juvenile court, where the People filed a new petition under section 707 to transfer Chacon to criminal court once again.

At a September 2023 hearing on the new transfer motion, the People argued that Chacon was not making sufficient progress toward rehabilitation. They noted that Chacon had obtained a tattoo on the back of his head reading "GBZ," referring to his gang, the Ghetto Boyz. When the court ordered Chacon to shave his head so the tattoo could be photographed, Chacon refused to do so before relenting two months later in response to a second court order. The People also submitted Chacon's disciplinary record from county jail, which indicated that he had been cited for eight violations, including two incidents in which he and several others ganged up on a fellow inmate, punching and kicking him. Chacon's attorney submitted a report from a psychologist diagnosing Chacon with posttraumatic stress disorder, attention deficit hyperactivity disorder, pervasive depressive disorder, and polysubstance abuse, and noting that Chacon had been abused by his mother before being placed in the foster care system.

At the conclusion of the hearing, the juvenile court reviewed the evidence in light of the factors set out in section 707, subdivision (a)(3), and found by clear and convincing evidence that Chacon was not amenable to rehabilitation while under the jurisdiction of the juvenile court. The court acknowledged that it had previously found Chacon amenable to rehabilitation, but noted that the circumstances had changed in that only two years of juvenile court jurisdiction remained. In addition, the court cited the tattoo, and Chacon's refusal to comply with a court order to shave his head to reveal it, as

6

evidence that Chacon had recommitted himself to gang life.  The court thus granted the motion and ordered Chacon to be transferred to criminal court.

## DISCUSSION

### A.    Background on Section 707 and Standard of Review

Following the enactment of Proposition 57, section 707 provides the only method for the People to try a juvenile offender in criminal court.  To transfer a minor under this section, the prosecution must show "by clear and convincing evidence that the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court." (§ 707, subd. (a)(3).)  The statute sets out five criteria that juvenile courts must consider in making this determination.  These are "[t]he degree of criminal sophistication exhibited by the minor" (*id.*, subd. (a)(3)(A)(i)); "[w]hether the minor can be rehabilitated prior to the expiration of the juvenile court's jurisdiction" (*id.*, subd. (a)(3)(B)(i)); "[t]he minor's previous delinquent history" (*id.*, subd. (a)(3)(C)(i)); the "[s]uccess of previous attempts by the juvenile court to rehabilitate the minor" (*id.*, subd. (a)(3)(D)(i)); and "[t]he circumstances and gravity of the offense alleged in the petition to have been committed by the minor" (*id.*, subd. (a)(3)(E)(i)).

The juvenile court does not consider these factors in isolation.  Instead, the statute "requires the juvenile court to consider all five factors together in determining whether the minor is amenable to rehabilitation." (*In re E.P.* (2023) 89 Cal.App.5th 409, 417.)  Nor does the statute dictate the importance of one factor over another:  "[T]he court has the discretion to conclude that one or more of the five factors predominate so as to determine the result, even though some or all of the other factors might point to a different result." (*Ibid.*)

7

Each of the five factors in turn includes instructions for the court to follow when evaluating that factor. For example, section 707, subdivision (a)(3)(A)(ii) states that when considering the minor's criminal sophistication, "the juvenile court shall give weight to any relevant factor, including, but not limited to, the minor's age, maturity, intellectual capacity, and physical, mental, and emotional health at the time of the alleged offense; the minor's impetuosity or failure to appreciate risks and consequences of criminal behavior; the effect of familial, adult, or peer pressure on the minor's actions; the effect of the minor's family and community environment; the existence of childhood trauma; the minor's involvement in the child welfare or foster care system; and the status of the minor as a victim of human trafficking, sexual abuse, or sexual battery on the minor's criminal sophistication."

Following Chacon's transfer hearing in 2023, these instructions changed. At the time of the hearing, they stated that "the juvenile court *may* give weight to any relevant factor." (Former § 707, subd. (a)(3)(A)(ii), italics added; accord, *id.*, subds. (a)(3)(B)(ii), (a)(3)(C)(ii), (a)(3)(D)(ii), (a)(3)(E)(ii).) Senate Bill 545, effective January 1, 2024, amended the statute to change "may" to "shall," thereby "mak[ing] consideration of any relevant factor mandatory." (Stats. 2023, ch. 716.)

We review a juvenile court's decision whether to transfer a minor to criminal court for abuse of discretion. (*People v. Superior Court (Jones)* (1998) 18 Cal.4th 667, 680; *In re Miguel R.* (2024) 100 Cal.App.5th 152, 165.) Under this standard, "[t]he court's factual findings are reviewed for substantial evidence, and its legal conclusions are reviewed de novo. [Citation.] A decision based on insufficient evidence or the court's ' "erroneous

8

understanding of applicable law" ' is subject to reversal." (*Kevin P. v. Superior Court* (2020) 57 Cal.App.5th 173, 187.)

The abuse of discretion standard applies not only to the juvenile court's consideration of individual factors, but also its "ultimate finding 'that the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court.' (§ 707[, subd. ](a)(3).) Because the juvenile court must make that finding by clear and convincing evidence, we 'determine whether the record, viewed as a whole, contains substantial evidence from which a reasonable trier of fact could have made the finding of high probability demanded by' the clear and convincing evidence standard." (*In re Miguel R.*, *supra*, 100 Cal.App.5th at p. 165.)

## B.     Substantial Evidence Supported the Juvenile Court's Finding that Chacon Is Not Amenable to Rehabilitation

Chacon argues that the juvenile court erred in its analysis of four of the five factors under section 707, subdivision (a)(3),[2] and contends that, as a result, no substantial evidence supports its finding that he is not amenable to rehabilitation under the jurisdiction of the juvenile court. We consider each factor in turn and conclude that substantial evidence supported the juvenile court's finding.

---

[2] The juvenile court described Chacon's "previous delinquent history" (§ 707, subd. (a)(3)(C)(i)) as "unremarkable," and thus apparently placed little emphasis on this factor in determining that Chacon was not amenable for rehabilitation in the juvenile system. Chacon does not take issue with this aspect of the juvenile court's decision.

### 1. *Criminal Sophistication*

The juvenile court found that both Chacon himself and the crime he committed showed "criminal sophistication." (§ 707, subd. (a)(3)(A)(i).) The court reasoned that Chacon "sought out a gun ahead of time, hunted the young man down, found the young man, and then when the young man renounced Primera Flats, . . . he shot him in cold blood and killed him." The court found that Chacon himself was sophisticated because he "knew how to access the gun," "was a member of Ghetto Boyz and was doing work supporting Ghetto Boyz," and apparently painted graffiti "advertising or bragging about what occurred to [Owens]."

Chacon argues the juvenile court erred both in its description of the facts and by failing to give weight to Chacon's youth, immaturity, and intellectual capacity, as well as other factors such as the childhood trauma he suffered and his involvement in the foster care system.

We are not persuaded. First, any errors in the juvenile court's factual description of the alleged murder were insignificant. Chacon argues that "[t]here is no evidence that the shooting of the victim was intended to benefit the gang," but the record indicates that Ghetto Boyz viewed Primera Flats as an enemy, and Owens's friend testified that Chacon challenged Owens about his affiliation with Primera Flats just before shooting him. In addition, regardless of whether Chacon personally wrote the graffiti celebrating the shooting, its existence shows that Ghetto Boyz members viewed the killing as a victory for their gang over Primera Flats and intended that it should be advertised to others. More importantly, substantial evidence supported the juvenile court's finding that Chacon showed sophistication in the way he planned the attack on

10

Owens in advance, obtaining a gun the previous day and then finding and ambushing Owens.

Next, we disagree with Chacon's argument that the court misapplied the law by failing to give weight to evidence relating to factors such as Chacon's "age, maturity, intellectual capacity, and physical, mental, and emotional health at the time of the alleged offense," "the existence of childhood trauma," and his "involvement in the child welfare or foster care system." (§ 707, subd. (a)(3)(A)(ii).) Although Chacon's hearing took place prior to the enactment of Senate Bill 545, at a time when the statute stated that the juvenile court "may give weight" to factors such as those listed above, the record shows the juvenile court did not ignore these factors in making its decision.

At the beginning of the 2023 hearing, the court stated that it had reviewed the transcript of the 2018 hearing, and "I still stand by [the] determinations" made at the 2018 hearing. One of those determinations at the prior hearing was that Chacon acted with criminal sophistication. In explaining its reasoning during the 2018 hearing, the court mentioned Chacon's "history of abuse, . . . not being nurtured," and "childhood trauma" but stated that these factors "just do[ ] not answer the criminal sophistication, do[ ] not emphatically respond to that." Later in the 2023 hearing, Chacon's attorney discussed Chacon's history of "extraordinary abuse," and its importance in the analysis of Chacon's sophistication. Chacon's attorney noted that a psychological report on Chacon stated that "criminal sophistication can be evaluated by all the pertinent things: given the weight of a person's age, maturity, intellectual capacity, mental health, [and] the failure to appreciate risks and consequences." The court responded that the report in question

was largely "based on the general understanding of brain development," rather than on anything about Chacon personally. In the court's view, this made the study of limited use because the Legislature was "aware of [studies on] brain development" when it amended section 707, but nevertheless continued to allow 16-year-olds to be transferred to criminal court. In other words, the Legislature must have believed that the immaturity of a 16-year-old's brain did not preclude a finding of criminal sophistication.

In light of these indications that the juvenile court took Chacon's immaturity and history of abuse and trauma into account, and the state of the law at the time of the hearing, we find no reversible error in the court's failure to mention those factors expressly when making its ruling on criminal sophistication. This is not a situation like that in *C.S. v. Superior Court* (2018) 29 Cal.App.5th 1009, where the court vacated the juvenile court's transfer order because the order "did not specify whether it found [the criminal sophistication] criterion weighed in favor of transfer, against transfer, or was neutral," and thus could not "meaningfully determine whether [the minor]'s challenges to the juvenile court's findings have merit." (*Id.* at pp. 1030-1031.) Here, the court explored the issue of criminal sophistication along with evidence adduced both at the original hearing in 2018 and the 2023 hearing, and we can meaningfully assess Chacon's challenge to that criterion.[3]

---

[3] Because the juvenile court in this case, unlike in *C.S. v. Superior Court*, explained its reasoning in sufficient detail to allow for our review, we likewise reject Chacon's argument that we must remand the case with instructions for the juvenile court

12

We also conclude that substantial evidence supports the juvenile court's determination that Chacon was criminally sophisticated. Chacon may disagree with certain aspects of the juvenile court's description of his alleged crime, but the court was correct in the essential details: Evidence indicated that Chacon committed the murder with premeditation, that he obtained the gun in advance, sought out Owens, found him the following day, and shot and killed him even after Owens disavowed membership in Primera Flats. Furthermore, evidence indicated that Chacon was a member of the Ghetto Boyz, and that he committed the murder at least in part for the benefit of the gang as an attack on their rival Primera Flats. We do not discount the significant evidence of Chacon's childhood trauma and his immaturity as a 16-year-old, but even giving weight to those factors as required by section 707 as amended, a factfinder could reasonably find that Chacon was criminally sophisticated, and that this factor supported his transfer to criminal court.

2. *Rehabilitation Prior to Expiration of Jurisdiction*

Section 707, subdivision (a)(3)(B)(i) instructs juvenile courts to consider "[w]hether the minor can be rehabilitated prior to the expiration of the juvenile court's jurisdiction." This language closely mirrors the ultimate question in a transfer hearing, that is, whether "the minor is . . . amenable to rehabilitation while under the jurisdiction of the juvenile court." (*Id.*, subd. (a)(3).) The juvenile court initially skipped over subdivision (a)(3)(B)(i) when analyzing the five factors because,

---

to state more thoroughly "the reasons supporting the court's finding that the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court." (§ 707, subd. (a)(3).)

in the court's view, "being rehabilitated prior to the expiration" of jurisdiction is the same as "the overall analysis" in a transfer hearing, and there was no reason to discuss the same issue twice. The court proceeded to discuss the remaining factors before then addressing the ultimate question of amenability to rehabilitation (along with section 707, subdivision (a)(3)(B)(i)'s nearly identical language) and "find[ing] by clear and convincing evidence the minor is not amenable to the treatment of the juvenile court."

Chacon argues the court erred in its approach, and that the court was required to consider "[w]hether the minor can be rehabilitated prior to the expiration of the juvenile court's jurisdiction" (§ 707, subd. (a)(3)(B)(i)), together with the four other factors laid out in section 707, subdivision (a)(3), as part of the broader analysis of whether "the minor is . . . amenable to rehabilitation while under the jurisdiction of the juvenile court." (*Id.*, subd. (a)(3).) He cites legislative history to this effect: An Assembly committee report stated that "[t]his bill does not eliminate the requirement that the court weigh the five factors. This bill would *further require* that the court find that the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court in order to transfer the minor to a court of criminal jurisdiction." (Assem. Com. on Public Safety, com. on Assem. Bill 2361, *supra*, Apr. 5, 2022, p. 7, italics added; accord, *In re S.S.* (2023) 89 Cal.App.5th 1277, 1294 ["The amended version of section 707 requires the juvenile court to consider each of the five statutory criteria and how those criteria affect [the] minor's amenability to rehabilitation while under the jurisdiction of the juvenile court"].)

But the legislative history does not explain how "[w]hether the minor can be rehabilitated prior to the expiration of the

14

juvenile court's jurisdiction" (§ 707, subd. (a)(3)(B)(i)) is meaningfully different from whether "the minor is . . . amenable to rehabilitation while under the jurisdiction of the juvenile court" (*id.*, subd. (a)(3)) such that a separate analysis would be useful, or how a failure to answer that question twice instead of once is prejudicial. Courts have distinguished between the two provisions by interpreting section 707, subdivision (a)(3)(B)(i) as focusing on "whether there is enough time to rehabilitate the minor while the minor is still eligible to remain under juvenile court jurisdiction" (*In re Miguel R.*, *supra*, 100 Cal.App.5th at p. 166), rather than on rehabilitation more broadly, and Chacon urges us to accept this analysis.

We need not decide whether this interpretation of section 707, subdivision (a)(3)(B)(i) is correct because, even if so, the juvenile court's failure to analyze that subdivision at the time it analyzed the four remaining factors was harmless. The transcript shows that the court was aware that at the time of the 2023 hearing, Chacon was 25 years old, and that if the court allowed the case to proceed within juvenile court and found that Chacon committed the murder, he would remain under juvenile court jurisdiction for only two more years.[4] As the court noted,

_____

[4] See section 607, subdivision (c) ["The court may retain jurisdiction over a person who is found to be a person described in Section 602 by reason of the commission of an offense listed in subdivision (b) of Section 707 until that person attains 25 years of age, or two years from the date of commitment to a secure youth treatment facility pursuant to Section 875, whichever occurs later, if the person, at the time of adjudication of a crime or crimes, would, in criminal court, have faced an aggregate sentence of seven years or more"].

15

"Four years have [passed since the 2018 hearing] and he's older, and we have less ability to effect rehabilitation. And that's just the unfortunate circumstances of where he was and the law changed." The court ultimately decided that Chacon was not amenable to rehabilitation by "look[ing] at what has occurred since . . . the court's ruling" in 2018 and determining, in light of the GBZ tattoo and Chacon's refusal to follow a court order regarding shaving his head, that Chacon remained a Ghetto Boyz member and was unable to rehabilitate: "If he's unable to follow the court's orders . . . without resistance and reluctance, how is he going to follow the guidance of therapists and probation?" We fail to see how this conclusion would have changed if the court had included a preliminary step in its analysis focusing on the fact that Chacon would have no more than two years to rehabilitate under juvenile court jurisdiction.

### 3.    *Prior Efforts at Rehabilitation*

Under section 707, subdivision (a)(3)(D)(i) the juvenile court must consider the "[s]uccess of previous attempts by the juvenile court to rehabilitate the minor." When performing this analysis, "the juvenile court shall give weight to any relevant factor, including, but not limited to, the adequacy of the services previously provided to address the minor's needs." (*Id.*, subd. (a)(3)(D)(ii).)

When analyzing this factor, the juvenile court noted that Chacon "did receive therapy, though I think that the services he did receive were not as full as they should have been or could have been, and I think that he could have received better therapy, which we could have had better results potentially." Chacon argues that this was insufficient, and the juvenile court "should . . . have also considered the rehabilitative services

16

provided to [Chacon] in juvenile hall and his exemplary record of progress and growth."

The record shows the court did take Chacon's prior performance in juvenile hall into account. His progress in juvenile hall was the basis for the juvenile court's finding in 2018 that Chacon could be rehabilitated, and as we have noted, the court stated at the outset of the 2023 hearing that it had reviewed the transcripts of that prior hearing and "still [stood] by those determinations." Chacon's attorney reminded the court of Chacon's progress and argued that it "carries tremendous weight." The juvenile court agreed, "It did carry . . . weight." Despite this acknowledgment, the court expressed skepticism, in light of Chacon subsequently getting a GBZ tattoo and his refusal to shave his head to allow it to be photographed, that he had made as much progress as the court previously believed. The court suspected that "when [Chacon] recognizes it is to his advantage to conform, he is very capable and willing to conform. [But when h]e doesn't see an advantage, he doesn't." Thus, when he was first transferred to criminal court, he stopped attempting to behave, but "when he realized the law had changed [with the enactment of Assembly Bill 2361] and he ha[d] an opportunity to" return to juvenile court, he once again began behaving. The juvenile court's interpretation of Chacon's record is not unreasonable, and the court did not err in its analysis of this factor.

4.     *The Circumstances and Gravity of the Offense*

The final factor courts must consider under section 707 is "[t]he circumstances and gravity of the offense alleged in the petition." (§ 707, subd. (a)(3)(E)(i).) The court analyzed this factor as follows: "With regard to the gravity of the offense, I

17

can't think of an offense that's much more grave than this one. He seeks a gun. He hunts this person down. . . . This person, [Owens], is cooperative. [Owens] is responsive to his inquiry about the gang, Primera Flats. He answers and . . . disses Primera Flats, and still, even though there is nothing to cause this, he blatantly and in cold blood without any remorse kills [Owens]. And this is appalling, and I can't think of a situation that was more dire and more offensive than what occurred there."

Chacon argues that the juvenile court misstated the nature of the alleged offense, contending there is no evidence that Chacon "hunted down" Owens, nor that he acted "in cold blood without any remorse." Once again, this is largely a matter of semantics. The evidence at the preliminary hearing indicated that Chacon obtained the gun the day before the murder because he was upset with Owens, and then approached Owens the next day while he was walking down the street. Whether one characterizes this as Chacon seeking out Owens or hunting him down, it is the same predatory behavior. Similarly, as to Chacon's challenge to the court's statement that he acted "without remorse," the evidence showed that the murder was planned at least one day in advance, Owens did nothing to provoke Chacon (waving at Chacon's girlfriend was no provocation), and Chacon later admitted the killing to his cousin without any demonstration of remorse. The juvenile court's characterization of Chacon's actions was apt.

Chacon also contends the juvenile court erred by failing to account for his "mental and emotional development" (§ 707, subd. (a)(3)(E)(ii)) as a factor in the circumstances and gravity of the offense. The lack of discussion on this topic, however, would appear to be because there was little evidence in the record

18

relevant to this factor in determining the gravity of the offense. The transcript of the 2023 hearing shows that, although Chacon's attorney argued that Chacon's mental and emotional development were relevant to his criminal sophistication, the attorney did not argue that these factors lessened the gravity of the offense. In his appellate briefs, Chacon cites two reports from psychologists on this subject, but the findings in both reports are inconsistent with the evidence in the record regarding the murder. Thus, in a 2023 report, a psychologist wrote, "It is possible that Chacon, who suffered from [post-traumatic stress disorder] and admitted to previously carrying a weapon for protection, reacted in response to perceived danger during the dispute, as a result of his severely compromised mental state." This is inconsistent with Daniel's testimony that Chacon was angry with Owens and sought out the gun the day before the shooting, as well as Owens's friend's testimony that Chacon initiated the confrontation with Owens. A second psychologist, who examined Chacon in 2017, wrote that Chacon's intellectual disabilities would put him "at risk for being manipulated by others." But there is no evidence in the record of such manipulation. Instead, all available evidence indicates that the shooting was Chacon's idea, and he reached out to his cousin Daniel to find a gun.

The juvenile court stated, "I can't think of an offense that's much more grave than this one," and substantial evidence supports that description. The court's consideration of Chacon's mental and emotional development was for it to weigh, and we find no abuse of discretion in its conclusion.

5.    *Substantial Evidence Supported the Juvenile Court's Analysis of All Five Factors Together*

Although the juvenile court must consider each of the five factors specified in section 707, subdivision (a)(3), its ultimate decision depends on an analysis of "all five factors together" (*In re E.P., supra*, 89 Cal.App.5th at p. 417), and the court may place as much emphasis on each factor as the evidence warrants. (*Ibid.*) Our review of the juvenile court's determination is likewise holistic, in that "we 'determine whether the record, viewed as a whole, contains substantial evidence from which a reasonable trier of fact could have made the finding of high probability demanded by' the clear and convincing evidence standard." (*In re Miguel R., supra*, 100 Cal.App.5th at p. 165.)

In this case, the juvenile court's analysis of the record was sound. The court took seriously its prior determination in the 2018 hearing that Chacon could be rehabilitated, and also took into account the traumas he had suffered in the past and the real efforts he had made toward rehabilitation. Nevertheless, in light of the gravity of the offense, Chacon's evident inability to renounce his gang membership and recommitment to gang life since the 2018 hearing, and the passage of time, which left only two years for Chacon to rehabilitate under the juvenile court's jurisdiction, the court concluded that clear and convincing evidence showed he was not amenable to rehabilitation. There is room for disagreement regarding certain details of the court's analysis, but its conclusion was supported by substantial evidence, and the court did not abuse its discretion by granting the transfer motion.

**C. The Recent Amendments to Section 707 Do Not Require Remand Because the Record Clearly Indicates the Court Would Reach the Same Conclusion**

As we noted above, Chacon's 2023 hearing took place prior to the enactment of Senate Bill 545, which amended section 707 to "make consideration of any relevant factor mandatory." (Stats. 2023, ch. 716.) We agree with Chacon that the amendment, by "mak[ing] it more difficult to transfer juveniles from juvenile court, which . . . reduces the possible punishment for juveniles" (*In re S.S.*, *supra*, 89 Cal.App.5th at p. 1289), is an ameliorative statute that applies retroactively to minors like Chacon whose cases were not final when the law became effective. (See *ibid.*; *In re J.M.* (2024) 103 Cal.App.5th 745, 753, review granted Sept. 25, 2024, S286259.)

The primary manner in which the amendments in Senate Bill 545 affect the juvenile court's analysis is on the question of criminal sophistication. As we explained above, Chacon's attorney argued that Chacon's mental health, maturity, and intellectual capacity were relevant to that issue. The court indicated that it had read the psychologist's report on the subject, but it did not mention these factors when explaining its finding that Chacon was criminally sophisticated. Ordinarily, we presume the juvenile court followed the law, and "[e]rror may not be presumed from a silent record." (*People v. Brown* (2007) 147 Cal.App.4th 1213, 1229.) But that principle does not apply here, where the law at issue has changed since the juvenile court made its ruling, and there was no reason for the court to believe it was required to give weight to the factors set out in section 707, subdivision (a)(3)(A)(ii).

21

Nevertheless, it does not follow that remand is required to allow the juvenile court to conduct a third transfer hearing. Our Supreme Court explained in the context of a change in sentencing law that when an ameliorative statute takes effect after the superior court has made a ruling, " 'the appropriate remedy is to remand for resentencing unless the record "clearly indicate[s]" that the trial court would have reached the same conclusion "even if it had been aware that it had such discretion." ' [Citations.]" (*People v. Salazar* (2023) 15 Cal.5th 416, 425.) Both sides agree, as do we, that the analysis is the same for the change in law at issue in this case, and the same standard applies.

There is no need for remand in this case because although the juvenile court did not explicitly address the issue of Chacon's psychological problems and history of trauma in its 2023 ruling, it did so in 2018. In that earlier ruling, the court acknowledged that Chacon's "life was filled with assaults, abandonment, [and] abuse," and explicitly measured that history against the sophistication demonstrated in the commission of the offense. The court noted, "The crime itself was sophisticated. . . . [Chacon], he, himself is criminally sophisticated. He's a member of Ghetto Boyz. He sought out a gun, knew a location where to get a gun, got the gun, knew the source that he had, [and] confronted [Owens] . . . . And I do find those actions are sophisticated[. W]ith regard to the consideration of the acts [and] his impetuosity [or] failure to appreciate risks, and . . . effective familial adult to peer pressure—there's just nothing at that point that has [been] shown, other than his history of abuse, being abused, and not being nurtured which they talk about childhood trauma, but that just does not answer the criminal sophistication, does not emphatically respond to that."

In short, at the 2018 hearing, the juvenile court considered the evidence of childhood trauma and abuse and found that it was "emphatically" less important than the criminal sophistication demonstrated by Chacon's actions. Chacon argues that the court's 2018 findings are not conclusive because a different standard of proof applied at that time. Before the recent amendments to section 707, "the prosecution [bore] the burden of establishing by a preponderance of the evidence the minor is not a suitable candidate for treatment under the juvenile court system." (*J.N. v. Superior Court* (2018) 23 Cal.App.5th 706, 715.) Under the standard in effect at the 2023 hearing, the People must prove "by clear and convincing evidence that the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court." (§ 707, subd. (a)(3); accord, *In re E.P.*, *supra*, 89 Cal.App.5th at p. 416.)

But the issue at stake is not the juvenile court's ultimate determination on the 2018 transfer motion; instead, it is the court's analysis of Chacon's criminal sophistication. The record shows the court gave serious consideration to the evidence of his psychological problems and history of trauma, but concluded Chacon's actions nevertheless demonstrated criminal sophistication. To remand the case to the juvenile court for a new hearing would require the court to perform the same analysis, with no reason to believe it would come to a different conclusion. This is particularly true in this case, where the court stated during the 2023 hearing, conducted under the clear and convincing evidence standard, that it had reviewed the transcript from the 2018 hearing and continued to stand by its prior conclusions.

23

Chacon makes the same argument regarding the change in the standards applicable to the fifth factor, "[t]he circumstances and gravity of the offense" (§ 707, subd. (a)(3)(E)(i)), but this claim fails for similar reasons. At the time of the hearing, the statute stated that "the juvenile court may give weight to any relevant factor, including . . . the person's mental and emotional development" (former § 707, subd. (a)(3)(E)(ii)), but Senate Bill 545 once again changed the "may" in this provision to a "shall." As we noted above (see Discussion, part B.4, *ante*), there was no basis in the record for finding that Chacon's mental and emotional development meaningfully reduced the gravity of the offense. Thus, there would be no purpose in remanding to require the juvenile court to make a finding on this issue.

## DISPOSITION

The juvenile court's order is affirmed.

NOT TO BE PUBLISHED

WEINGART, J.

We concur:

ROTHSCHILD, P. J.          BENDIX, J.

24