Filed 2/20/26  P. v. Orozco CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H052263 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. Nos. 213441, C1519712) |
| v. | |
| JEFFREY MICHAEL OROZCO, | |
| Defendant and Appellant. | |

In 2019, appellant Jeffrey Michael Orozco pled no contest to multiple crimes in two cases stemming from his involvement in a criminal street gang. Orozco also admitted to having suffered one prior strike conviction (Pen. Code[1], § § 667, subds. (b)–(i), 1170.12) and a prior serious felony conviction (§ 667, subd. (a)).  In exchange for his plea, the trial court sentenced Orozco to a total sentence of 25 years in state prison in case No. 213441.

Following an appeal, a different panel of this court reversed the judgment and remanded the matter for the trial court to consider striking the enhancement for Orozco's prior serious felony conviction (§ 667, subd. (a)) based on recent changes to applicable sentencing law.  (*People v. Orozco* (Jan. 27, 2022, H046401) [nonpub. op.].)  (*Orozco*).)[2] On remand, the trial court declined to exercise its discretion to strike the enhancement.

---

[1] Unspecified statutory references are to the Penal Code.

[2] On our own motion, we take judicial notice of the opinion in Orozco's prior appeal in the same underlying case.

On appeal, Orozco argues that the trial court abused its discretion and violated his due process rights by relying on inadmissible evidence in making its ruling and declining to strike the serious felony enhancement.

For the reasons discussed below, we reverse the trial court's order and remand for resentencing consistent with this opinion.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    *Factual Background*

The following facts are quoted from this court's prior opinion in *Orozco, supra,* H046401:

"In October 2012, Sergeant Dan Livingston sought and obtained a search warrant for a number of residences, including defendant's home at 3207 Mt. Vista Drive in San Jose, his business, Tatted Up II, at 2902 Alum Rock Avenue in San Jose, and defendant's person and vehicles. The warrant was directed at discovering documents reflecting communications with members of the Nuestra Familia, as well as evidence of drug sales, illegal gang activity, firearms, methamphetamine, cocaine, and other paraphernalia. [¶] In the affidavit attached to the search warrant application, Livingston explained that Nuestra Familia is a Hispanic prison street gang, whose name means 'Our Family.' It was started in the mid-1960s. Organizationally, Nuestra Familia members 'on the street form into street regiments.' Nuestra Familia gang members who are not incarcerated 'have the additional duty of making money through organized crime[,] primarily drug trafficking.' Money derived from drug trafficking 'goes into a common fund called the "bank," ' which is then 'reinvested into the activities of the regiment and / or is sent to members in custody.' A subset of Nuestra Familia is Nuestra Raza (NR). [¶] The affidavit relied on statements made by confidential informants, two of whom were publicly known by the time of trial and others whose identities remain sealed.

"In January 2012, Livingston assisted with an interview of Luis Barrios, who had been taken into custody for bank robbery, and later conducted two more interviews.

Barrios agreed to make statements under an agreement that he could not be prosecuted for those statements, and 'for possible consideration in his pending case.' In the affidavit, Livingston allowed that Barrios had 'potentially lied' in his initial interview with San Jose police detectives. Barrios maintained that the falsehood was minor and that he had only failed to provide a name. Livingston stated that, at least in the interviews he personally conducted, he did 'not believe [Barrios] has provided false or misleading information.' [¶] Barrios had been incarcerated at a number of facilities between about 2000 and 2011. In July 2011, he was paroled. Upon his release, he was given the position of NR regiment leader. He was in charge of four NR regiment members, including defendant. [¶] Barrios identified defendant as an NR member, 'who was currently a regiment member' and has functioned off and on for the [Nuestra Familia] on the streets since 2003 in "all kinds of capacities." ' Defendant also had 'ties to a lot of the Eastside gangs and he talk[ed] to several of the shot callers, collect[ed] monthly dues and . . . deal[t] with issues with the various gangs.' Defendant also acted as a 'shot caller for Varrio 95.' Barrios stated that defendant owned 'Tatted Up II[,] which was bought with drug proceeds and loans.' Barrios had previously worked at 'Tatted Up I on Santa Clara Street,' which defendant also partially owned, 'as a tattoo artist.' Tatted Up II was used as a meeting place for Norteño gang members 'about the directives that they needed to pay taxes to the [Nuestra Familia].' 'Barrios said "9 times out of 10" there is something at Tatted Up II which he said was usually guns. Barrios said they would keep them in the portable boxes for each tattooing station.' Barrios was told when guns were present because of his criminal liability if he was caught in possession of a gun. [¶] Barrios described a number of different crimes that defendant had committed. According to Barrios, defendant used 'guys . . . from the [tattoo] shop to sell drugs.' Although he had not personally seen defendant conduct a drug deal, 'he was aware [that defendant] was using members of [Varrio 95] to sell drugs' based on conversations with members. Barrios elaborated that defendant 'picks up approximately a quarter pound [of

3

methamphetamine] at a time and . . . likes to have it sold before he picks it up.' Barrios stated that defendant was 'using his sister's house . . . to store drugs and weapons.' Barrios had 'met [defendant's] sister before' and knew her as ' "Jessica." ' Jessica told Barrios 'she had a closet full of guns she was holding' for defendant. Finally, defendant 'would help collect the hood tax' and used Tatted Up II to store it until it was picked up.

"After being taken into custody for various drug crimes in March 2012, Adam Vitale agreed to cooperate with authorities for consideration in his pending criminal matter. Vitale admitted to being a longtime NR member. According to Vitale, he knew defendant as 'an NR member but was not sure if [defendant] was a regiment member or just an associate.' He never saw defendant 'directly involved in conversations . . . about regiment business at the shop.' '[H]e believed [defendant] sold methamphetamine but never saw him sell.' Vitale claimed that 'Barrios was using the tattoo shop for meetings with regiment members.'

"On October 23, 2012, the search warrant, CSW43375, was executed at the 12 locations identified in the application, including defendant's home and Tatted Up II. The search of the residence yielded a .38-caliber handgun, a spent .38-caliber casing, two live .40-caliber rounds, a radio scanner, and other indicia and evidence of gang membership. The search of Tatted Up II yielded, among other things, a mobile radio scanner, a .357 Magnum revolver, a .38-caliber revolver, ammunition, and other indicia of gang membership."

## B.    *Procedural History*

### 1.  *Charges*, *Plea Agreement*, *and Sentencing[3]*

On May 31, 2013, a grand jury for the County of Santa Clara issued an indictment charging Orozco and over 40 other co-defendants with numerous gang-related offenses.

---

[3] As the record on appeal only contains documents filed after remand following Orozco's prior appeal, we draw some of the relevant procedural history from our prior opinion in *Orozco, supra,* H046401.

4

In case No. 213441, Orozco was charged with participating in a criminal street gang (§ 186.22, subd. (a); count 1); conspiracy to sell methamphetamine (§ 182, subd. (a)(l), Health and Saf. Code, § 11379; count 2); conspiracy to sell cocaine (§ 182, subd. (a)(l), Health and Saf. Code, § 11352; count 3); possession of a firearm by a felon (§ 29800, subd. (a)(1); count 63); and possession of ammunition by a felon (§ 30305, subd. (a)(1); count 64). The indictment also alleged that Orozco had committed the conspiracy charges in counts 2 and 3, as well as the possession charge in count 63, in association with or for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)(A)). In case No. C1519712, Orozco was charged with witness dissuasion by threat of violence (§ 136.1, subd. (c)(1); count 1). It was further alleged that Orozco had suffered a prior strike conviction[4] (§ § 667, subds. (b)-(i), 1170. 12) and a prior serious felony conviction (§ 667, subd. (a)).

On June 15, 2018, Orozco entered a plea of no contest to counts 1, 2, 3, and 63 in case No. 213441, and admitted the respective gang enhancement allegations as to counts 2, 3, and 63. Orozco also entered a plea of no contest to count 1 in case No. C1519712. Orozco additionally admitted to one prior strike conviction for each case, as well as one prior serious felony conviction in case No. 213441. In exchange for his plea, the People agreed to a total sentence of 25 years in prison, consisting of 19 years in prison for case No. 213441 and a consecutive term of six years in prison for case No. C1519712.

## 2. *First Appeal*

Orozco appealed his conviction, citing numerous claims of error regarding the search warrant that had led to his arrest. (*Orozco, supra,* H046401.) He also argued, and the People conceded, that the matter should be remanded for resentencing to allow the trial court to consider exercising its new discretion to dismiss or strike the prior serious

---

[4] According to the People's briefing in the trial court, there were two strike convictions alleged in both cases, and the People agreed to dismiss one strike from each case as part of Orozco's negotiated disposition.

felony enhancement, based on amendments to sections 667, subdivision (a) and 1385, following the passage of Senate Bill No. 1393 (2017–2018 Reg. Sess.).[5] While this court found no merit to Orozco's claims of error, this court agreed that the trial court should be afforded an opportunity to exercise its discretion under the current version of section 1385 to strike the five-year enhancement imposed under section 667, subdivision (a). (*Orozco, supra,* H046401.) This court therefore reversed and remanded with instructions for the trial court to determine whether striking the enhancement was appropriate. (*Orozco, supra,* H046401.)

### 3. Proceedings on Remand

#### a. Parties' Briefing On Resentencing

Following remand, both parties filed several briefs on the issue of whether Orozco's section 667, subdivision (a) enhancement should be dismissed. In the People's initial brief filed on November 2, 2023, they contended that it would not be in the furtherance of justice to dismiss the enhancement based on the circumstances of the underlying offenses, Orozco's continued involvement in gang activity while his cases were pending resolution, and the substantial benefit he received from his plea bargain. While the People acknowledged that certain mitigating factors under section 1385, subdivision (c), were applicable to Orozco's case, the People argued that the court should not exercise its discretion to dismiss. The People noted that Orozco's crimes reflected his strong commitment to the gang, based on the following: (1) he used his business as a location for the gang to conduct their business; (2) he facilitated gang member meetings to further the goals of the gang: (3) he engaged in narcotics transactions both in his place of business and the neighboring communities; (4) he recruited dealers to sell drugs for

---

[5] Senate Bill No. 1393 (2017–2018 Reg. Sess.), which became effective on January 1, 2019, amended sections 667 and 1385 to provide trial courts discretion to strike five-year sentencing enhancements based on prior serious felony convictions under section 667, subdivision (a)(1).

him and earn more money for the gang; (5) he collected dues on behalf of the gang; and (6) he kept a firearm in his business for other gang members to use. The People further indicated that even after Orozco's case was pending, he continued to send written directives from county jail to gang members and also sent a threatening letter from jail to a cooperating witness in order to dissuade the witness from further cooperation. The People also pointed to California Department of Corrections (CDCR) prison records reflecting that Orozco had numerous cell phone violations while in prison, including incidents where he attempted to destroy the phone in his possession during cell searches, which reflected his continued involvement in gang activity. The People additionally noted that based upon the CDCR records, Orozco had self-identified as a member of the Norteño gang when first processed into prison in January 2019, and a confidential memorandum from October 2019 identified Orozco as actively involved in facilitating a communication network or a network of connections within the prison system for the gang. Further, the People claimed that Orozco had significantly benefited from receiving a negotiated sentence of 25 years, as his total exposure for both cases would have been 100 years to life. Finally, the People argued that because of Orozco's role in the gang as one of the leaders of the Nuestra Familia organization, and his continued involvement in the gang while in custody based on his usage of illegal cell phones, Orozco would pose a danger to public safety if his sentence were reduced.

In Orozco's sentencing brief, he argued that four mitigating factors under section 1385, subdivision (c), applied in his case: (1) multiple enhancements were alleged against him (§ 1385, subd. (c)(2)(A)); (2) the application of the enhancement resulted in a sentence of over 20 years (§ 1385, subd. (c)(2)(B)); (3) the current offenses were not violent felonies as defined under section 667.5, subdivision (c) (§ 1385, subd. (c)(2)(F)); and (4) the enhancement was based on a conviction that was over five years old (§ 1385, subd. (c)(2)(H)). Orozco claimed that because the presence of even one mitigating factor weighed greatly in favor of dismissal, the presence of four factors should conclusively

7

demonstrate that dismissal of the five-year enhancement was appropriate. In addition, Orozco argued that the court should exercise its discretion in noting that he only participated in one conspiracy, not two, as there was only a single conspiracy to sell both the drugs as noted in counts 2 and 3, and he should not have been charged or sentenced with two separate counts of conspiracy. Orozco therefore asserted that his conviction violated the Double Jeopardy Clause, and the trial court should either strike the conviction or dismiss the sentence on count 2 in addition to striking the five-year enhancement. Orozco also provided a "Social Biography" packet, which contained pictures and letters from family members and several friends describing his familial ties and strong support system.

Both parties also filed responses to each other's initial briefs. In the People's response, they argued that the matter had been remanded for the limited purpose of determining whether the five-year enhancement should be dismissed, and a full resentencing was not authorized. The People further argued that the facts of the case reflected that Orozco was properly charged and convicted for his involvement in two separate conspiracies to sell cocaine and methamphetamine. Finally, the People noted that the trial court could look at a variety of factors in determining whether to strike an enhancement, including Orozco's behavior in prison, which was reflective of his continued participation in the gang. The People also indicated that Orozco's prison records reflected a failure to participate in vocational activities or other self-help tools, as well as a failure to apply himself in order to succeed in the academic courses he took.

In Orozco's response to the People's initial brief, he argued that the People's claims of his continued gang involvement were based on unreliable, inadmissible hearsay from a confidential informant and unfounded theories based on his cell phone violations. Orozco claimed that he procured the cell phones in order to communicate with his family, particularly during restrictive lockdowns that took place during the COVID-19 pandemic. Orozco also claimed that he had taken substantial advantage of rehabilitative programs

8

offered to him while incarcerated, including his enrollment in college courses and position for over two years as a critical worker authorized by the Americans with Disabilities Act (ADA).

### b. *Hearing and Order*

On January 22, 2024, the trial court held an evidentiary hearing on the resentencing issue. At the hearing, Orozco testified on his own behalf, with specific focus on the nature of the cell phone violations he had incurred while in prison. On direct examination, Orozco admitted to possessing various cell phones without permission, but testified that he solely used them to communicate with his family during the COVID-19 pandemic when phones and visits were "completely closed off." Orozco also denied that his cell phone usage was connected to possible gang involvement. Orozco specifically noted that the California Department of Corrections and Rehabilitation (CDCR) had conducted an investigation into his cell phone usage and did not find any nexus between the phones used and a security threat group, which Orozco defined as the term used by the CDCR for gangs. Orozco further indicated that the information accusing him of being involved in creating a gang communication network was based on an interview with a single informant, and never resulted in further investigation, such as a write-up for rule violations. Orozco also testified that he had been working as an ADA critical worker for the past two years, where he provided assistance to inmates with disabilities. Finally, Orozco testified that in the 12 years that he had been in prison, he had "steered clear" of any gang involvement and not engaged in any violence, thus reflecting his attempt to rehabilitate.

On cross-examination, Orozco admitted that he had purchased cell phones from other inmates using his commissary funds and also admitted to intentionally breaking one of the phones and flushing the SIM card in July 2020. Orozco also testified that he had not been a member of the Norteño gang since his "late 20s," and denied identifying as a

9

Norteño member when he was first incarcerated; he also denied ever being a member of the Nuestra Familia or Nuestra Raza gangs.

After taking the matter under submission, the trial court issued a written order on May 2, 2024. The trial court first noted that Orozco's maximum prison exposure for the charged offenses and allegations in case No. 213441 would have been considerably higher than his negotiated sentence of 19 years. In addition, the trial court indicated that because the scope of the remittitur was limited to determining whether the five-year serious felony enhancement should be stricken, it would not consider the merits of Orozco's double jeopardy argument regarding the two conspiracy charges. With respect to the section 667, subdivision (a) enhancement, the trial court declined to exercise its discretion to strike the enhancement as follows: "[T]he parties have offered extensive briefing and argument as well as multiple statements in support of the defendant; including statements from the defendant. The trial court has read and considered all the material, testimony and argument presented. Based on the serious nature of the charged crimes, the defendant's criminal history, and the fact that defendant and the People agreed to a 19-year resolution (which the trial court here finds to be an appropriate resolution,) the trial court will not exercise its discretion to strike the Penal Code section 667 [subdivision] (a) five-year prior. The 19-year sentence that defendant agreed to when he pleaded no contest will remain unchanged."

Orozco timely appealed.

## II. DISCUSSION

### A. *Applicability of Section 1172.1 to Proceedings*

As a preliminary matter, we first address Orozco's claim in his opening brief that the instant appeal stems from the trial court's denial of his petition for resentencing pursuant to section 1172.1 filed on November 15, 2023. As correctly noted by the Attorney General, the record on appeal does not contain such a petition, nor is there any indication in the record that section 1172.1 was implicated in the proceedings on remand.

10

Instead, this court's prior opinion, as well as the proceedings on remand, confirm that Orozco's matter was remanded to the trial court for the limited purpose of allowing the trial court to determine whether to exercise its newfound discretion under section 1385 to dismiss the serious felony enhancement. Accordingly, we do not address any arguments raised by either party regarding the applicability of section 1172.1.

**B.     *Abuse of Discretion in Declining to Strike Enhancements***

Orozco argues that the trial court abused its discretion and violated his constitutional due process rights by declining to strike the section 667, subdivision (a) serious felony enhancement. He first claims that the trial court relied heavily on inadmissible hearsay evidence from the CDCR reports contained in the People's briefs, which was unreliable and "constitutionally deficient." Orozco further contends that the trial court failed to apply the correct legal standards under the current version of section 1385 in making its determination of whether to strike the enhancement. Finally, he argues that the trial court's "multiple legal errors" were prejudicial because there was a reasonable probability that he would have received a more favorable outcome but for such errors.

### 1.  *Applicable Law and Standard of Review*

Senate Bill No. 81, effective January 1, 2022, added subdivision (c) to section 1385. Section 1385, subdivision (c) provides, "(1) Notwithstanding any other law, the court shall dismiss an enhancement if it is in the furtherance of justice to do so, except if dismissal of that enhancement is prohibited by any initiative statute. [¶] (2) In exercising its discretion under [subdivision (c)], the court shall consider and afford great weight to evidence offered by the defendant to prove that any of the mitigating circumstances in [the subparagraphs to subdivision (c)(2)] are present. Proof of the presence of one or more of these circumstances weighs greatly in favor of dismissing the enhancement, unless the court finds that dismissal of the enhancement would endanger public safety. 'Endanger public safety' means there is a likelihood that the dismissal of the

11

enhancement would result in physical injury or other serious danger to others." (§ 1385, subd. (c)(1) & (2).) The mitigating circumstances identified in the subparagraphs include, among others: "(B) Multiple enhancements are alleged in a single case. In this instance, all enhancements beyond a single enhancement shall be dismissed. [¶] "(C) The application of an enhancement could result in a sentence of over 20 years. In this instance, the enhancement shall be dismissed." (§ 1385, subd. (c)(2)(B) & (C).)

The California Supreme Court recently clarified the framework within which a trial court must review requests to strike enhancements under the current version of section 1385, subdivision (c). (See *People v. Walker* (2024) 16 Cal.5th 1024, 1033–1035 (*Walker*) [interpreting section 1385, subdivision (c)(2)].) *Walker* indicated that "absent a danger to public safety, the presence of an enumerated mitigating circumstance will generally result in the dismissal of an enhancement unless the sentencing court finds substantial, credible evidence of countervailing factors that 'may nonetheless neutralize even the great weight of the mitigating circumstance, such that dismissal of the enhancement is not in furtherance of justice.' [Citation.]" (*Walker, supra,* at p. 1036.) "[T]his 'furtherance of justice' (§ 1385, subd. (c)(1)) inquiry requires a trial court's ongoing exercise of 'discretion' (*id.*, subd. (c)(2)). Thus, notwithstanding the presence of a mitigating circumstance, trial courts retain their discretion to impose an enhancement based on circumstances 'long deemed essential to the "furtherance of justice" inquiry.' [Citations.]" (*Walker,* at p. 1033.)

In addition, in *People v. Gonzalez* (2024) 103 Cal.App.5th 215, 225 (*Gonzalez*), one of our appellate courts provided guidance on the meaning of "danger to public safety" under section 1385. In determining whether dismissing an enhancement would endanger public safety, "[t]he plain words of the statute do not support [a] trial court's singular focus on whether the defendant *currently* poses a danger." (*Gonzalez, supra,* at p. 228.) "Although the current dangerousness of the defendant is an appropriate factor to consider, as it will have some bearing on whether dismissing the enhancement would

endanger the public, a crucial part of the inquiry is how the dismissal … will impact the length of the defendant's sentence." (*Ibid*.) Thus, a "currently dangerous defendant who will be released from prison within a short timeframe might be found by the trial court to pose a greater danger to the public than a defendant who is currently dangerous but who has no prospect of release from prison until [he] is elderly." (*Ibid*.)

We review a trial court's decision not to strike a sentence enhancement under section 1385 for abuse of discretion. (*People v. Carmony* (2004) 33 Cal.4th 367, 371; *People v. Mendoza* (2023) 88 Cal.App.5th 287, 298 (*Mendoza*).) The abuse of discretion standard is highly deferential. (*Mendoza*, *supra*, at p. 298.) When, " ' "as here, a discretionary power is statutorily vested in the trial court, its exercise of that discretion 'must not be disturbed on appeal *except* on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice.' " ' " (*Ibid*.)

"We presume that the trial court acted to achieve legitimate sentencing objectives. [Citation.] The burden is on the party challenging the sentencing decision to show that the court abused its discretion. [Citation.] We may not presume error from a silent record. [Citation.] 'Unless the record affirmatively demonstrates otherwise, the trial court is deemed to have considered all the relevant sentencing factors set forth in the rules' [Citations.] " (*People v. Knowles* (2024) 105 Cal.App.5th 757, 765 (*Knowles*).) In addition, as a general rule " 'a trial court is presumed to have been aware of and followed the applicable law.' [Citations.] … Thus, where a statement of reasons is not required and the record is silent, a reviewing court will presume the trial court had a proper basis for a particular finding or order." (*People v. Stowell* (2003) 31 Cal.4th 1107, 1114 (*Stowell*).)

A trial court abuses its discretion by rendering a sentencing decision based on impermissible factors or on an incorrect legal standard. (*People v. Knoller* (2007) 41 Cal.4th 139, 156; see also *People v. Nakano* (2023) 89 Cal.App.5th 623, 635 [an abuse of

13

discretion occurs when the trial court applies the " 'wrong legal standard' "].)
" ' "Defendants are entitled to sentencing decisions made in the exercise of the 'informed discretion' of the sentencing court." ' " (*People v. Flores* (2020) 9 Cal.5th 371, 431.)

### 2. Analysis

#### a. Evidentiary Error

As a preliminary matter, the Attorney General argues that because Orozco makes no citations to the record in support of his claims of improper evidentiary rulings by the trial court, his claims should be rejected. We agree that Orozco has failed to affirmatively demonstrate that the trial court made any specific rulings on the admission of hearsay evidence or made any statements reflecting that it erroneously relied on unreliable evidence in making its final ruling.

"On appeal, we presume that a judgment or order of the trial court is correct, ' "[a]ll intendments and presumptions are indulged to support it on matters as to which the record is silent, and error must be affirmatively shown." ' [Citation.]" (*People v. Giordano* (2007) 42 Cal. 4th 644, 666.) Here, while Orozco claims on reply that the record affirmatively demonstrates that the trial court "adopted the prosecution's brief, which itself relied on unverified prison memoranda and unsworn statements from confidential informants," Orozco does not cite any portion of the record, nor do we find any indication therein, to support this contention. Apart from noting that the parties submitted extensive briefing, at no point in its ruling did the trial court discuss the contents of the prison records referenced in either party's brief; indeed, the trial court did not mention Orozco's gang involvement at all, including citing as a basis for declining to dismiss the enhancement.

Further, even if we were to assume the trial court did review and consider the prison records detailing the cell phone violations and Orozco's continued gang involvement, Orozco also provided substantial testimony in the trial court refuting these allegations. Based on the trial court's indication in its ruling that it had "read and

14

considered all the material, testimony and argument presented," we find no basis to presume that the trial court ignored Orozco's testimony and solely relied on the prison records in making its decision, as Orozco claims. (See *Knowles, supra,* 3105 Cal.App.5th at p. 765 [noting that the reviewing court presumes the trial court was aware of and followed the applicable law when making its ruling].) Therefore, absent any affirmative showing from Orozco that the trial court improperly relied on inadmissible evidence, we find no merit to his claims of evidentiary error.

### b. *Remand is Required for the Trial Court to Consider Whether the Enhancement Should be Dismissed In Light of* People v. Walker *and* People v. Gonzalez

Orozco argues that because multiple mitigating circumstances were present, the trial court failed to "acknowledge or apply section 1385(c)'s presumption in favor of dismissing enhancements," and provided no explanation of any countervailing factors that weighed against this presumption. Orozco further claims that the trial court failed to make a finding that dismissal of the enhancements, and releasing Orozco early, would result in a danger to public safety, and contends that such a failure alone warrants reversal. Orozco additionally claims that the trial court "improperly defer[ed]" to the previous sentencing decision instead of conducting a "fresh" examination as contemplated by section 1385 and required by *Walker*, *supra,* 16 Cal.5th 1024.

In reviewing the trial court's findings, we note that the court did not explicitly conclude that dismissal of the enhancements would result in a danger to public safety. Indeed, the trial court did not discuss public safety in its findings, nor did it make any statements related to the possibility of Orozco committing further crimes if his sentence were to be reduced, and he were to be released early, following dismissal of the enhancements. (See *Gonzalez, supra,* 103 Cal.App.5th at p. 228.)

Under *Walker,* when the trial court does not conclude that dismissal would result in a danger to public safety, the court must assign "great weight" to any mitigating

factors, if present, and exercise its discretion in determining whether dismissal would be in the furtherance of justice. The *Walker* court held that the term "great weight" did not create a presumption in favor of dismissal, but should be interpreted to mean that "absent a danger to public safety, the presence of an enumerated mitigating circumstance will generally result in the dismissal of an enhancement unless the sentencing court finds substantial, credible evidence of countervailing factors that 'may nonetheless neutralize even the great weight of the mitigating circumstance, such that dismissal of the enhancement is not in furtherance of justice.' [Citation.]" (*Walker, supra,* 16 Cal.5th at p. 1036.) The *Walker* court specifically emphasized that "[w]ithout credible evidence to support findings on aggravating circumstances, judges could disregard mitigating factors without a proper basis for doing so. This would be incompatible with the 'great weight' the Legislature has attached to the enumerated mitigating circumstances." (*Ibid.*) In making this finding, the court indicated that it approved the analysis set forth in *People v. Ortiz* (2023) 87 Cal.App.5th 1087 (*Ortiz*) , which concluded that "section 1385, subdivision (c)(2)'s mandate to give 'great weight' to enumerated mitigating circumstances requires a sentencing court to 'engage[] in a holistic balancing with *special emphasis* on the enumerated mitigating factors.' " (*Walker, supra,* 16 Cal.5th at p. 1034, quoting *Ortiz, supra,* at p. 1096.)

Turning to the instant matter, we recognize that *Walker* and *Gonzalez* had not been decided at the time of the trial court's ruling, and that in making its findings, the trial court did not use the word "mitigating factors," or specifically discuss the mitigating factors listed under section 1385, subdivision (c). While we acknowledge that a silent record does not, on its own, reflect an abuse of discretion (see *Stowell, supra,* 31 Cal.4th at p. 1114), we find it is not evident from the instant record and findings that the trial court would have still exercised its discretion not to dismiss the enhancement if it had the guidance provided in those cases. (See *People v. Salazar* (2023) 15 Cal.5th 416, 424 [noting that if the trial court is unaware of the scope of its informed discretion at the time

16

of sentencing and fails to exercise it in making a sentencing decision, the appellate court must " 'remand for resentencing unless the record "clearly indicate[s]" that the trial court would have reached the same conclusion "even if it had been aware that it had such discretion" ' "].)  As discussed above, the trial court did not make any indication that Orozco would pose a danger to public safety if he were to be released early as a result of a reduced sentence.  (See *Gonzalez, supra,* 103 Cal.App.5th at p. 228.)  Further, while the trial court's final order cited the serious nature of Orozco's offenses, as well as his criminal history.  it is unclear if such findings reflected the trial court engaging in a " 'holistic balancing with *special emphasis* on the enumerated mitigating factors' [Citation]" as required under *Walker*.  (See *Walker, supra,* 16 Cal.5th at p. 1036.)  Under these circumstances, we conclude that remand for resentencing is required.  In reaching our decision, we do not express any position on how the court should exercise its discretion under section 1385 regarding dismissal of the section 667, subdivision (a) enhancement.

### III.    DISPOSITION

The court's order is reversed, and the matter is remanded for resentencing consistent with this opinion.

_____
                        Wilson, J.

WE CONCUR:


_____
             Grover, Acting P. J.


_____
             Lie, J.


*People v. Orozco*
H052263